Bernard **FORD** and Mardel Ford, Appellees,

v.

**IOWA DEPARTMENT OF HUMAN SERVICES, Appellant.**

Esther **GLODEN**, Appellee,

v.

**IOWA DEPARTMENT OF HUMAN SERVICES, Appellant.**

No. 92–362.

Supreme Court of Iowa.

May 19, 1993.

Bonnie J. Campbell, Atty. Gen., John M. Parmeter, Special Asst. Atty. Gen., and Daniel W. Hart, Asst. Atty. Gen., for appellant.

Thomas A. Krause, of Legal Services Corp. of Iowa, Des Moines, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, CARTER, and NEUMAN, JJ.

NEUMAN, Justice.

In 1988 Congress enacted legislation to ameliorate the financial hardship suffered by aging couples faced with the high cost of nursing home care. These consolidated appeals examine the extent to which the Iowa Department of Human Services (DHS), in implementing that legislation, may use the cost of an annuity as the yardstick by which to measure the noninstitutionalized spouse's monthly maintenance needs allowance. On judicial review, the district court found DHS violated its rulemaking authority in doing so. We reverse and remand for an order enforcing the agency's decision.

I. *Background facts and proceedings.* Resolution of this controversy turns primarily on an analysis of agency authority under Iowa Code chapter 17A (1991), the Administrative Procedure Act. But to put that analysis in a factual context, we begin with a brief legislative history of pertinent provisions of the Medicare Catastrophic Coverage Act, 42 U.S.C. § 1396r-5 (1990) (hereafter "MCCA").

As already noted, Congress passed the MCCA in part to aid citizens whose spouses reside in nursing homes or other medical institutions and receive Medicaid benefits. Under prior law, nearly all of a couple's assets had to be depleted before either one could satisfy Medicaid eligibility requirements, leaving the spouse who remained in the community in a financially precarious position. H.R.Rep. No. 105(II), 100th Cong., 2d Sess. 65–68 (1988), *reprinted in* 1988 U.S.C.C.A.N. 803, 888–92 (hereafter "House Report"). The MCCA was de-

signed to avoid impoverishing the "community spouse." *Id.* at 892.

Congress was also mindful that—as part of a welfare program—Medicaid eligibility rules should not "facilitate the transfer of accumulated wealth from nursing home patients to their nondependent children." *Id.* at 896. Thus the MCCA requires that an institutionalized spouse's income and resources cannot exceed published supplemental security income (SSI) limits. *Id.* at 888–92. For example, when these proceedings arose, an institutionalized spouse owning more than $2000 was required to apply that resource toward medical bills and nursing home expense. 42 U.S.C. § 1382(a); 20 C.F.R. 416.1205(c). Only when that resource dipped below the SSI limit would the person become eligible for Medicaid. House Report at 888, 892. Certain assets, such as a house, car, personal effects and household goods, are not counted towards the SSI limit. *Id.* at 892.

Under this regulatory scheme, all of a couples' "countable" resources are regarded as available to the institutionalized spouse, except an amount called the "community spouse resource allowance," or CSRA. 42 U.S.C. § 1396r–5(c)(2). The CSRA is one-half of the couple's total resources, or $60,000, whichever is less. 42 U.S.C. § 1396r–5(f)(2); 441 Iowa Admin.Code § 75.5(3)(d). The CSRA is not considered available to the institutionalized spouse and thus is not counted toward the SSI limit. 42 U.S.C. § 1396r–5(c)(2), (4).

The institutionalized spouse is also permitted to divert a portion of monthly income to the community spouse. This deduction from the institutionalized spouse's monthly income is known as the "community spouse monthly income allowance." 42 U.S.C. § 1396r–5(d)(1)(B). The allowance depends on a figure called the "minimum monthly maintenance needs allowance," which (at the time of these proceedings) was a maximum of $1500. 42 U.S.C. § 1396r–5(d)(3)(C). In other words, the institutionalized spouse can divert however much the community spouse needs to bring that spouse's monthly income to the $1500 needs allowance. 42 U.S.C. § 1396r–5(d)(1)(B), (d)(2).

If diversion of the institutionalized spouse's income to the community spouse does not reach the $1500 monthly maintenance allowance, the agency can increase the CSRA upon application by either spouse. 42 U.S.C. § 1396r–5(e)(2)(C). The controversy before us centers on this provision.

The Fords and Glodens are both couples with one spouse in a nursing home (the "institutionalized spouse") and the other remaining in the couple's home (the "community spouse"). In the Ford case the institutionalized spouse filed an application for Medicaid with DHS, and in Gloden the community spouse requested determination of the Medicaid "community spouse resource allowance" without an application for Medicaid. *See* 42 U.S.C. § 1396r–5(e)(1). In both cases, the initial community spouse resource allowance left significant resources that had to be spent before Medicaid eligibility for the institutionalized spouse could be established. In the Ford case, the initial community spouse resource allowance was one-half ($32,177.26) of the couple's total countable resources of $64,354.53, leaving the other half to be counted for Medicaid eligibility for the institutionalized spouse. In the Gloden case, the initial community spouse resource allowance was the maximum, then $60,000, from the couple's total countable resources of $136,847.07. This left $76,847.07 to be counted toward Medicaid eligibility for the institutionalized spouse.

Both couples requested an administrative hearing to increase the community spouse resource allowance and thus decrease the amount counted for Medicaid eligibility for the institutionalized spouse. In each case, an administrative law judge increased the CSRA to an amount sufficient, if invested in bank accounts and certificates of deposit, to generate enough additional monthly income to reach $1500. In the Fords' case, the community spouse had $1165.92 monthly income; he was thus entitled to sufficient resources to generate an additional $334.08 per month. The administrative law

judge determined that, at the prevailing interest rates, the sum of $51,728.25 was necessary to generate that amount and thus bring the community spouse's monthly income up to $1500. The ALJ thus set the CSRA for the Fords at $51,728.25.

In the Glodens' case, the community spouse had a monthly income of only $308, requiring an additional $1192 to bring her up to $1500. However, the sum of all the couple's resources would not generate that amount, so the administrative law judge set the CSRA at $136,847.07, leaving no resources available to the institutionalized spouse.

On administrative review, the DHS director decided that, instead of looking at the investment of resources necessary to generate sufficient interest income (the "interest-only" method), the agency should look at the resources necessary to purchase a single-premium life annuity that would furnish monthly payments to the community spouse in an amount sufficient to bring the spouse's income up to $1500. It was determined that in the Ford case an annuity would cost less than the initial CSRA, so the initial CSRA of $32,177.26 was affirmed. In the Gloden case an annuity paying $1192 per month could be purchased for a single-premium payment of $112,986, an amount substantially less than the $136,847 set aside under the interest-only method. DHS amended the Gloden CSRA accordingly. In neither case were the parties required to purchase an annuity; their applications to increase the CSRA were simply resolved on the basis that their needs could be met through the liquidation of assets and purchase of an annuity.

The Fords and Glodens petitioned the district court to challenge these decisions. Their petitions for judicial review rested on two legal arguments. First, they argued that the interest-only method is mandated under federal and state law. Second, they argued that even if the annuity method were allowable, it could only be applied following rule-making proceedings and it was unlawful for the agency to adopt such a policy in a contested case proceeding.

The district court agreed with the petitioners and reversed the agency, ruling that the annuity method could not be applied until it had been formally adopted as an agency rule. The court did not decide the legality of the annuity method. The court ordered the agency to compute the CSRA in each case using the interest-only method. It is from this ruling that DHS appeals.

II. *Scope of review.* In judicial review proceedings, the district court functions in an appellate capacity to correct errors of law. *Anderson v. Iowa Dep't of Human Servs.*, 368 N.W.2d 104, 107 (Iowa 1985). On appeal, we determine whether the district court correctly applied the law. *Id.*

III. *Issues on appeal.* On appeal, DHS reasserts its position that it was unnecessary to formally adopt a rule permitting the annuity method of valuing the CSRA prior to applying such a method in these cases. It also contends that the annuity method violates neither state nor federal Medicaid regulations. We shall consider the arguments in turn.

A. *Rule-making vs. case-by-case adjudication.* This case illustrates the tension in administrative law between formalized rule-making and case-by-case adjudication of statutory standards. On the one hand, Iowa Code section 17A.3(2) operates to invalidate any agency rule or "other written statement of law or policy" that has not first been subjected to public inspection and indexing as required by section 17A.3(1)(c) and (d). Yet the administrative procedure act itself exempts from the definition of "rule" any "determination, decision, or order in a contested case." Iowa Code § 17A.2(7).

This court has previously held, in the case of a proposed rule, that section 17A.3(2) does not come into play unless the agency applies the rule as a matter of law, rather than merely applying the policy considerations underlying the rule that are relevant to the factual situation presented. *Young Plumbing & Heating Co. v. Iowa Natural Resources Council*, 276 N.W.2d 377, 383 (Iowa 1979). This was consistent,

we held, with the general rule that agencies cannot avoid rule-making procedure by issuing "statements of *general applicability and future effect* in contested case proceedings." *Id.* at 382 (quoting Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access to Agency Law, the Rulemaking Process,* 60 Iowa L.Rev. 731, 837 (1975).

■ At the same time, *Young* recognized that the choice of whether to develop policy by rule, contested case, or both, lies "[within] the informed discretion of the administrative agency." *Id.* (quoting *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947)). Abuse of this discretion may be shown where agencies authoritatively cite rules that are published in employee manuals and the like but have not been adopted in accordance with section 17A.3. Thus in *Anderson v. Iowa Department of Human Services,* 368 N.W.2d 104, 108 (Iowa 1985), we held that Medicaid eligibility guidelines printed in a DHS manual, but not formally adopted by rule, could not be relied upon by a hearing officer to decide the substantive rights of owners of a joint bank account. Similarly, the court of appeals held in *Fears v. Iowa Department of Human Services,* 382 N.W.2d 473, 476 (Iowa App. 1985), that the terms of a Medicaid benefits manual relied upon by DHS workers as a statement of general applicability and future effect, could not, absent formalized rule-making procedures, provide the basis for denying benefits.

■ Against this backdrop we consider the parties' competing claims. The federal Medicaid provision at issue requires DHS to allow the community spouse "an amount adequate to provide such a minimum monthly maintenance needs allowance." 42 U.S.C. § 1396r–5(e)(2)(C). DHS argues that its director merely decided to use an annuity calculation as the method for determining what the appropriate amount should be. The method had not been adopted as a departmental policy when

these cases arose, nor was it contained in any rule or proposed rule.[1] The petitioners, on the other hand, persuaded the district court that the director's decision reflected a policy of general application and future effect which was invalid without formal adoption as a rule.

The record does not support the district court's conclusion. Although this appeal demonstrates that the methodology chosen by the director was applied in two cases, that is far from proof that the annuity method had been adopted as an ironclad rule without reference to individual circumstances making it more or less appropriate. To the contrary, the record reveals that the director compared the CSRA computed under the interest-only method with the computation yielded by the annuity method. The director concluded the latter was more in keeping with the overall purpose of these welfare regulations: to insure the community spouse's ability to live with independence and dignity, while minimizing the transfer of accumulated wealth to non-dependent children.

■ As noted by the Supreme Court in *Chenery,* an agency may not have had sufficient experience with an administrative problem "to warrant rigidifying its tentative judgment into a hard and fast rule." *Chenery,* 332 U.S. at 202, 67 S.Ct. at 1580, 91 L.Ed. at 2002. For that reason agencies are granted the discretion to address problems posed by new legislation on a case-by-case basis, rather than by general rule. *Id.,* 332 U.S. at 202, 67 S.Ct. at 1580, 91 L.Ed. at 2002. We view this case as an illustration of this principle at work. The district court's conclusion that the agency was attempting to circumvent its rule-making obligation is simply not supported by the record and must be reversed.

B. *Legality of annuity method under state and federal Medicaid regulations.* Although the district court reversed the agency on procedural grounds and did not reach the merits of the controversy, the question of the legality of the annuity

---

1. During the pendency of this appeal, the agency formally adopted the annuity method by rule. *See* 441 Iowa Admin.Code § 75.5(3)(f)(2) (1991).

method was fully briefed by the parties. Because the case reaches us solely on this question of law, the parties urge us to address it without further remand to the agency. In the interest of judicial economy, we shall do so. *See Mary v. Iowa Dep't of Transp.*, 382 N.W.2d 128, 131 (Iowa 1986) (appellate court reviews agency action "as the district court should have pursuant to section 17A.19(8)").

■■■ It is a fundamental tenet of administrative law that when a litigant challenges an agency's interpretation of statutes governing its work, the agency's expertise in such matters is entitled to deference. *Washington v. Bowen*, 815 F.2d 549, 554 (9th Cir.1987); *Second Injury Fund of Iowa v. Braden*, 459 N.W.2d 467, 468 (Iowa 1990). Given this deference, the burden rests upon the challenger to show the unreasonableness of the agency's policy choices. *Schroeder Oil Co. v. Iowa State Dep't of Revenue & Fin.*, 458 N.W.2d 602, 603 (Iowa 1990); *accord Connecticut Dep't of Income Maintenance v. Heckler*, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577, 583–84 (1985). The question is whether the annuity method chosen by DHS to calculate the minimum maintenance needs allowance in these cases is a reasonable means of achieving the ends intended by the applicable statutes and rules. We believe that it is.

■■■ The relevant statute at issue provides:

> If either such spouse establishes that the community spouse resource allowance (in relation to the amount of income generated by such an allowance) is inadequate to raise the community spouse's income to the minimum monthly maintenance needs allowance, there shall be substituted, for the community spouse resource allowance under subsection (f)(2) of this section, an amount adequate to provide such a minimum monthly maintenance needs allowance.

42 U.S.C. § 1396r–5(e)(2)(C). The dispute centers on the regulation's use of the word "income." The gist of the petitioners' argument is that community spouses should be able to meet their maintenance needs

from interest only, without touching the principal portion of the resource allowance. DHS argues that this interpretation would facilitate the transfer of the couple's accumulated wealth to their children or other heirs, contrary to legislative intent. We quite agree.

As already noted elsewhere in this opinion, Medicaid is a program for poor people "whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. The companion spousal provisions were enacted to insure that the spouse who remains in the community will have "a sufficient—*but not excessive*—amount of income and resources available [while the spouse] is in a nursing home at Medicaid expense." House Report at 888 (emphasis added). To that end, Congress designed a program to benefit welfare recipients, not persons seeking to benefit their heirs at the expense of other taxpayers.

Petitioners argue that an annuity payment cannot be considered "income" because the payment reflects a return on principal as well as income. DHS concedes that, in the context of determining Medicaid or SSI eligibility, the argument has validity. The argument follows from rules granting an exception for changes in the form of a resource. Under SSI rules, receipts from the sale or exchange of a resource are not counted as income but merely as resources that have changed their form. 20 C.F.R. § 416.1103(c). The exception rests on the principle that the same asset should not be counted twice in determining eligibility for SSI or Medicaid.

As DHS points out, however, here neither the cost of the proposed annuity nor the payments are being counted to determine eligibility. Rather, the cost of an annuity is being used to determine the amount of resources, otherwise available to the institutionalized spouse, that will be attributed to the community spouse and thus *not* factored into the determination of the institutionalized spouse's Medicaid eligibility. For this purpose, DHS argues, return of principal is indistinguishable from interest earnings and should be considered income. *See* 42 U.S.C. § 1382a(a)(2)(B) (for SSI eligibility purposes, unearned income

includes any payment received as annuity, pension, or retirement benefit); 20 C.F.R. § 416.1121(a) (same).

We find nothing in the regulations to overcome the reasonableness of DHS's interpretation. Moreover, the contrary position taken by the petitioners seems to us unreasonable and not in harmony with the regulatory scheme. If we were to rule, as a matter of law, that the income-only method must prevail, gross inequities would result between couples with adequate pension and social security income, and those with little income but substantial accumulated resources. A community spouse with pension income equal to the maintenance needs allowance would be limited to a maximum resource allowance of $60,000. But, under petitioners' analysis, a community spouse without monthly income could, at present rates, accumulate over one-quarter million dollars without reaching the CSRA limit. Such a result would clearly conflict with any notion that this is a welfare program for poor persons. It would also unfairly penalize couples that have accumulated rights to pensions or social security payments, rather than liquid assets, over their working life.

In effect, the annuity method requires the conversion of liquid assets into a private pension. Pension benefits may be used to meet the community spouse's monthly maintenance allowance. *See* 42 U.S.C. § 1396r–5(d)(2)(B). We believe that the department's demand that such a conversion be made in these cases is not unreasonable, given the assets available to the parties and the fact that the rules grant substantial exemption for homestead, personal effects, and an automobile.

In summary, we conclude that the annuity method chosen by DHS implements a reasonable interpretation of the MCCA. This interpretation is entitled to our deference. Therefore we reverse the judgment of the district court and remand for an order enforcing the department's ruling.

**REVERSED AND REMANDED.**