The ESTATE OF Roland KRUEGER,
by Leontina KRUEGER, personal
representative, Appellee,

v.

RICHLAND COUNTY SOCIAL SER-
VICES, Richland County Social Service
Board, and North Dakota Department of
Human Services, Appellants.

Civ. No. 940128.

Supreme Court of North Dakota.

Dec. 20, 1994.

Duane Houdek (argued), Legal Assistance
of North Dakota, Bismarck, for appellee.

Jean R. Mullen (argued), Asst. Atty. Gen.,
Atty. General's Office, Bismarck, for appel-
lants.

NEUMANN, Justice.

Richland County Social Services and the
Department of Human Services (collectively
"Department") appeal from a judgment re-
versing the Department's decision that Ro-
land Krueger could not transfer a Veterans
Administration aid and attendance allowance
to his community spouse, but instead had to
apply the allowance to his nursing home
costs.[1] We reverse the judgment and affirm
the Department's decision.

Krueger, an 80–year old military veteran,
resided in a Richland County nursing home
while his wife, Leontina, continued to reside
in their marital residence in Jamestown.

1. Roland died, and his wife, Leontina Krueger,
as personal representative of his estate, was sub-
stituted as a party under N.D.R.App.P. 43.

Krueger qualified for medical assistance ("Medicaid") to pay for his nursing home care. In addition to his Veterans Administration pension and social security payments, Krueger also received an aid and attendance allowance from the Veterans Administration. In December.1992, the Department informed Krueger that his monthly Medicaid recipient liability had increased to $336. This figure was arrived at by deducting his $45 personal allowance from an increased aid and attendance allowance of $381. In effect, when Krueger's aid and attendance allowance increased, the Department increased the amount Krueger had to pay to the nursing home before Medicaid would pay the remainder of the cost.

Krueger sought to transfer to Leontina for her maintenance as a community spouse the aid and attendance allowance, rather than apply it to the cost of his nursing home care. The Department denied his request. Krueger appealed to the district court, arguing the applicable administrative regulation, N.D.Adm.Code § 75–02–02.1–34(5)(a), was contrary to federal law and that he should be able to preserve the aid and attendance allowance for maintenance of his spouse.

The court, ruling that the Department's regulation conflicted with federal law, held that the Veterans Administration aid and attendance allowance could not be counted as income during the post-eligibility phase of determining the extent of Medicaid assistance, and that the aid and attendance allowance could be applied to maintenance of Leontina because it was "his to spend as he pleases, ... " The Department appealed.

■ When an appeal from an administrative agency involves a legal question, as is the case here, we will affirm the agency's decision unless it is not in accordance with the law. *Hettich v. Moore,* 514 N.W.2d 378, 379 (N.D.1994); N.D.C.C. §§ 28–32–21 and 28–32–19.

I

The Medicaid program, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396u, is a cooperative federal-state venture designed to afford medical assistance to persons whose income and resources are insufficient to meet the financial demands of necessary care and services. *Atkins v. Rivera,* 477 U.S. 154, 156, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). Once a state elects to participate, the federal government shares the costs if the state's plan complies with the requirements of the Act and the related regulations of the Secretary of Health and Human Services. *Atkins,* 477 U.S. at 154–55, 106 S.Ct. at 2457; 42 U.S.C. § 1396a.

The Medicaid program mandates coverage for the "categorically needy," 42 U.S.C. § 1396a(a)(10)(A), who are already eligible to receive Aid to Families with Dependent Children ("AFDC") or Supplemental Security Income ("SSI"). *Atkins,* 477 U.S. at 156, 106 S.Ct. at 2458. States may elect to determine eligibility for the categorically needy by using either SSI standards or their pre–1972 Medicaid eligibility standards. *Schweiker v. Gray Panthers,* 453 U.S. 34, 38–39, 101 S.Ct. 2633, 2637–2638, 69 L.Ed.2d 460 (1981); 42 U.S.C. § 1396a(f). A state that bases its coverage on its pre–1972 standards is referred to as a "§ 209(b) state" and is not required to provide coverage to SSI recipients who do not meet the generally more restrictive pre–1972 eligibility requirements. 1 J. Krauskopf, R. Brown, K. Tokarz, and A. Bogutz, *Elderlaw: Advocacy for the Aging* § 11.1 (2d ed. 1993) ("*Elderlaw*"). North Dakota is one of twelve § 209(b) states. *Id.* at n. 4.

SSI eligibility standards are not entirely irrelevant in § 209(b) states. States are also permitted to extend coverage to the "optional categorically needy," that is, those who are qualified for SSI but for some reason do not receive it, or who fail to qualify for SSI only because of their institutionalized status. *Herweg v. Ray,* 455 U.S. 265, 268–269, 102 S.Ct. 1059, 1062–1063, 71 L.Ed.2d 137 (1982). States can also extend coverage to the "medically needy," who meet nonfinancial eligibility requirements for AFDC or SSI but have income or resources exceeding the financial eligibility standards of those programs. *Atkins,* 477 U.S. at 157–59, 106 S.Ct. at 2459. North Dakota extends coverage to both the "optional categorically needy" and the "medi-

cally needy." *See* N.D.Adm.Code § 75–02–02.1–05(2) and (3).

There is no dispute that Krueger falls within the "medically needy" group. States electing to assist the medically needy must determine eligibility under standards that are "reasonable" and "comparable for all groups." 42 U.S.C. § 1396a(a)(17). In addition, the state plan must describe "the single standard to be employed in determining income and resource eligibility ..., and the methodology to be employed in determining such eligibility, which shall be no more restrictive than the methodology which would be employed under [SSI or AFDC] ...." 42 U.S.C. § 1396a(a)(10)(C)(i)(III). *See also Atkins,* 477 U.S. at 157–59, 106 S.Ct. at 2459; 42 C.F.R. § 435.401(c). Thus, eligibility standards can be no more restrictive than those used under the SSI program.

Determining an applicant's participation in the program involves a two-phase process: first, determining medical eligibility and financial eligibility based on the applicant's income and resources; and second, determining the extent of assistance to which the applicant is eligible based on another calculation of income.[2] The purpose of the second, post-eligibility phase, calculation of income is to determine the recipient's share of the cost for medical services. *See Sherman v. Griepentrog,* 775 F.Supp. 1383, 1385 (D.Nev.1991).

## II

In 1988, Congress enacted the Medicare Catastrophic Coverage Act, 42 U.S.C. § 1396r–5, which was in part designed "to ameliorate the financial hardship suffered by aging couples faced with the high cost of nursing home care." *Ford v. Iowa Dept. of Human Services,* 500 N.W.2d 26, 27 (Iowa 1993). *See also* H.R.Rep. No. 105(II), 100th Cong., 2d Sess. 65–68 (1988), *reprinted in* 1988 U.S.C.C.A.N. 803, 888–892. The legislation defines an "institutionalized spouse" as an individual who "is in a medical institution or nursing facility" and "is married to a spouse who is not in a medical institution or nursing facility...." 42 U.S.C. § 1396r–5(h)(1). A "community spouse" is "the spouse of an institutionalized spouse." 42 U.S.C. § 1396r–5(h)(2). Under prior law, nearly all of a couple's assets had to be depleted before either one could satisfy Medicaid eligibility requirements, leaving inadequate resources and income to support the community spouse. *Ford;* 1 *Elderlaw* § 11.30. To avoid impoverishing the community spouse, the Act clarifies Medicaid income eligibility guidelines and provides a greater community spousal allowance, thus permitting "the community spouse (usually the wife) to retain sufficient income and assets to live in the community without disqualifying the institutionalized spouse from eligibility for Medicaid." 1 *Elderlaw* § 11.30, at p. 395. *See also Ford; Whitehouse v. Ives,* 736 F.Supp. 368, 371 (D.Me.1990).

A community spouse is permitted a "resource allowance," generally defined as one-half of the couple's countable total resources, or $60,000, a sum adjusted annually according to the consumer price index, whichever is less. 42 U.S.C. § 1396r–5(c) and (f)(2); N.D.Adm.Code § 75–02–02.1–24(3). A community spouse is also permitted a "monthly

---

**2.** Described in *LaMore v. Ives,* 977 F.2d 713, 716 (1st Cir.1992), as "a virtually impenetrable thicket of legalese and gobbledygook," 42 U.S.C. § 1396a(a)(17) is said to mandate this two-phase process:

> "§ 1396a. State plans for medical assistance
> "(a) Contents
> "A State plan for medical assistance must—
>
>    *    *    *    *    *    *
>
> "(17) ... include *reasonable standards* (which shall be comparable for all groups ...) *for determining eligibility for and the extent of medical assistance* under the plan which (A) are consistent with the objectives of this subchapter, (B) provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and (in the case of any applicant or recipient who would, except for income and resources, be eligible for aid or assistance in the form of money payments under any plan of the State approved under subchapter I, X, XIV, or XVI, or part A of subchapter IV, or to have paid with respect to him supplemental security income benefits under subchapter XVI of this chapter) as would not be disregarded (or set aside for future needs) in determining his eligibility for such aid, assistance, or benefits, (C) provide for reasonable evaluation of any such income or resources, ..." (Emphasis added).

income allowance," that depends on the "minimum monthly maintenance needs allowance," a maximum sum of $1,500, inclusive of an excess shelter allowance, which is also subject to annual adjustment. 42 U.S.C. § 1396r–5(d)(1)(B), (d)(2), and (d)(3)(C); N.D.Adm.Code § 75–02–02.1–24(5)(b)(2).[3] An institutionalized spouse is allowed to transfer whatever income the community spouse needs to bring that spouse's monthly income to the minimum monthly maintenance needs allowance. *See Ford,* 500 N.W.2d at 28; 42 U.S.C. § 1396r–5(d)(1)(B) and (d)(2); N.D.Adm.Code § 75–02–02.1–24(5)(b)(2). If the income of the institutionalized spouse, combined with the income of the community spouse, is insufficient to reach the minimum monthly maintenance needs allowance, the community spouse is not entitled to a cash grant from the state to bring the combined income to that level, 1 *Elderlaw* § 11.33, but instead may apply for an increase in the community spouse resource allowance to "an amount adequate to provide such a minimum monthly maintenance needs allowance." 42 U.S.C. § 1396r–5(e)(2)(C). *See also* N.D.Adm.Code § 75–02–02.1–24(7)(e); *Ford.*

In determining the amount of an institutionalized spouse's income that is to be applied monthly to payment for the costs of institutional care, the institutionalized spouse's monthly income must be reduced by: (1) a personal needs allowance for the institutionalized spouse; (2) a community spouse monthly income allowance, but only to the extent income of the institutionalized spouse is made available to the community spouse; (3) a family allowance for each dependent family member; and (4) amounts for incurred expenses for medical or remedial care for the institutionalized spouse. *See* 42 U.S.C. § 1396r–5(d)(1); N.D.Adm.Code § 75–02–02.1–24(5)(b).

### III

The Veterans Administration administers programs providing "compensation," "dependency and indemnity compensation," and "pension" benefits to qualified individuals.

*See* 38 U.S.C. §§ 1101 *et seq.;* §§ 1301 *et seq.;* and §§ 1501 *et seq.* Compensation is "a monthly payment made by the Secretary to a veteran because of service-connected disability, or to a surviving spouse, child, or parent of a veteran because of the service-connected death of the veteran occurring before January 1, 1957." 38 U.S.C. § 101(13). Dependency and indemnity compensation is "a monthly payment made by the Secretary to a surviving spouse, child, or parent (A) because of a service-connected death occurring after December 31, 1956, or (B) pursuant to the election of a surviving spouse, child, or parent, in the case of such a death occurring before January 1, 1957." 38 U.S.C. § 101(14). A pension is "a monthly or other periodic payment made by the Secretary to a veteran because of service, age, or non-service-connected disability, or to a surviving spouse or child of a veteran because of the non-service-connected death of the veteran." 38 U.S.C. § 101(15). The pension program is a needs-based program designed to provide income assistance to those persons whose incomes fall below specified levels. *See* 38 U.S.C. § 1503.

In addition to receiving these benefits under the compensation and pension programs, disabled veterans, surviving spouses, and dependent surviving parents or children may also be entitled to an aid and attendance allowance. *See, e.g.,* 38 U.S.C. §§ 1114(r)(1), 1115(1)(E), 1311(c), 1315(g), 1502(b), 1521(d) and (f). A person is considered in need of regular aid and attendance if the person "is (1) a patient in a nursing home or (2) helpless or blind, or so nearly helpless or blind as to need or require the regular aid and attendance of another person." 38 U.S.C. §§ 1115(1)(E), 1311(c), 1315(g), 1502(b). *See also* 38 C.F.R. § 3.351(b) and (c).

The Secretary of Veterans Affairs has promulgated regulations to determine need for an aid and attendance allowance which include not only that the person is "a patient in a nursing home because of mental or physical incapacity," 38 C.F.R. § 3.351(c)(2), but that the person also exhibits the following:

"inability of claimant to dress or undress himself (herself), or to keep himself (her-

---

3. In 1993, the minimum monthly maintenance needs allowance could not exceed $1,769 per month. *See* 1 *Elderlaw* § 11.33. According to counsel for Krueger, the 1994 amount was $1,816.

self) ordinarily clean and presentable; frequent need of adjustment of any special prosthetic or orthopedic appliances which by reason of the particular disability cannot be done without aid (this will not include the adjustment of appliances which normal persons would be unable to adjust without aid, such as supports, belts, lacing at the back, etc.); inability of claimant to feed himself (herself) through loss of coordination of upper extremities or through extreme weakness; inability to attend to the wants of nature; or incapacity, physical or mental, which requires care or assistance on a regular basis to protect the claimant from hazards or dangers incident to his or her daily environment. 'Bedridden' will be a proper basis for the determination. For the purpose of this paragraph 'bedridden' will be that condition which, through its essential character, actually requires that the claimant remain in bed. The fact that claimant has voluntarily taken to bed or that a physician has prescribed rest in bed for the greater or lesser part of the day to promote convalescence or cure will not suffice. It is not required that all of the disabling conditions enumerated in this paragraph be found to exist before a favorable rating may be made. The particular personal functions which the veteran is unable to perform should be considered in connection with his or her condition as a whole. It is only necessary that the evidence establish that the veteran is so helpless as to need regular aid and attendance, not that there be a constant need. Determinations that the veteran is so helpless, as to be in need of regular aid and attendance will not be based solely upon an opinion that the claimant's condition is such as would require him or her to be in bed. They must be based on the actual requirement of personal assistance from others."

38 C.F.R. § 3.352(a).[4]

For many years, veterans hospitalized at government expense have had their aid and attendance allowance discontinued for the period of extended hospitalization under 38 U.S.C. § 5503(e):

"(e) Where any veteran in receipt of an aid and attendance allowance described in section 1114(r) of this title is hospitalized at Government expense, such allowance shall be discontinued from the first day of the second calendar month which begins after the date of the veteran's admission for such hospitalization for so long as such hospitalization continues. Any discontinuance required by administrative regulation, during hospitalization of a veteran by the Department, of increased pension based on need of regular aid and attendance or additional compensation based on need of regular aid and attendance as described in subsection (1) or (m) of section 1114 of this title, shall not be effective earlier than the first day of the second calendar month which begins after the date of the veteran's admission for hospitalization. In case a veteran affected by this subsection leaves a hospital against medical advice and is thereafter admitted to hospitalization within six months from the date of such departure, such allowance, increased pension, or additional compensation, as the case may be, shall be discontinued from the date of such readmission for so long as such hospitalization continues."

*See also* 38 C.F.R. § 3.552.

Because the aid and attendance allowance was generally discontinued immediately upon a veteran's entrance to the hospital on the theory that to continue payment during hospitalization would be a duplication because aid and attendance services were being provided directly by the government, the purpose of this provision was to encourage "veterans receiving aid and attendance pension to re-enter hospitals for brief stays without loss of their pension, thus preventing longer stays and more serious illnesses; ..." S.Rep. No. 1293, 88th Cong., 2d Sess., *re-*

4. Criteria for a "higher level aid and attendance allowance" are set forth in 38 C.F.R. § 3.352(b). The higher allowance is authorized in lieu of a regular aid and attendance allowance "if the Secretary finds that the veteran, in the absence of the provision of such care, would require hospitalization, nursing home care, or other residential institutional care." 38 U.S.C. § 1114(r)(2).

*printed in* 1964 U.S.C.C.A.N. 2853, 2857, 2875. "Hospitalization," for purposes of this provision, is limited to "[h]ospital treatment in a Department of Veterans Affairs hospital or in any hospital at Department of Veterans Affairs expense," or "[i]nstitutional, domiciliary or nursing home care in a Department of Veterans Affairs institution or domiciliary or at Department of Veterans Affairs expense." 38 C.F.R. § 3.551(a)(1) and (2).[5]

## IV

Because Krueger was receiving Medicaid under the medically needy category, his eligibility, as an aged and disabled individual, must be determined under regulations no more restrictive than those used under the SSI program, which are found in 20 C.F.R. Part 416. *See* 42 C.F.R. § 435.401(c)(2).

5. Veterans benefits and their relationship to the Medicaid program was statutorily addressed in 1990. In the Omnibus Budget Reconciliation Act of 1990, Congress recognized that there were no limitations under current law on payment of pensions to veterans in nursing homes who were eligible for Medicaid benefits and that, "in order for individuals to be covered under Medicaid all income of the person must be first utilized towards defraying the cost of nursing home care before Medicaid will provide coverage." H.Rep. No. 101–881, 101st Cong., 2d Sess. 218 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2222. Although not specifically addressing the aid and attendance allowance, Congress limited monthly pension payments to veterans at $90 for Medicaid-eligible recipients who have no spouse or child, and prohibited "any part of that $90 payment from being applied to the cost of the veteran's nursing-home care." H.Conf.Rep. No. 101–964, 101st Cong., 2d Sess. 982–983 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2374, 2687–2688. 38 U.S.C. § 5503(f) provides:

> "(f)(1) For the purposes of this subsection—
> "(A) The term 'Medicaid plan' means a State plan for medical assistance referred to in section 1902(a) of the Social Security Act (42 U.S.C. 1396a(a)); and
> "(B) the term 'nursing facility' means a nursing facility described in section 1919 of such Act (42 U.S.C. 1396r), other than a facility that is a State home with respect to which the Secretary makes per diem payments for nursing home care pursuant to section 1741(a) of this title.
> "(2) If a veteran having neither spouse nor child is covered by a Medicaid plan for services furnished such veteran by a nursing facility, no pension in excess of $90 per month shall be paid to or for the veteran for any period after the month of admission to such nursing facility.

Those regulations define "income" as "anything you receive in cash or in kind that you can use to meet your needs for food, clothing, and shelter. Sometimes income also includes more or less than you actually receive.... In-kind income is not cash, but is actually food, clothing, or shelter, or something you can use to get one of these." 20 C.F.R. § 416.1102. The regulations also define what is not income.

"Some things you receive are not income because you cannot use them as food, clothing, or shelter, or use them to obtain food, clothing, or shelter. In addition, what you receive from the sale or exchange of your own property is not income; it remains a resource. The following are some items that are not income:

\*     \*     \*     \*     \*     \*

> "(3) Notwithstanding any provision of title XIX of the Social Security Act, the amount of the payment paid a nursing facility pursuant to a Medicaid plan for services furnished a veteran may not be reduced by any amount of pension permitted to be paid such veteran under paragraph (2) of this subsection."

*See also* 38 C.F.R. § 3.551(i).

When this feature was extended by the Veterans' Benefits Act of 1992 "to a surviving spouse having no child," 38 U.S.C. § 5503(f)(5), it was noted pension savings would be "partially offset by increased federal Medicaid costs" because the reduced amount of pension would require Medicaid "to pay a larger portion of their nursing home expenses." H.Rep. No. 102–753(I), 102nd Cong., 2d Sess. 25 (1992), *reprinted in* 1992 U.S.C.C.A.N. 3646, 3667–3668.

These special provisions apply only when a veteran having no spouse or child, or a surviving spouse having no child, are covered by a Medicaid plan for services furnished by a nursing home. They do not address a situation where, here, an institutionalized veteran receiving Medicaid has a dependent spouse.

We further note that in 1986, an attempt was made to preclude per diem payments made by the Veterans Administration to State Veterans' Homes from being considered a third-party liability under the Medicaid program. *See* S.Rep. No. 99–444, 99th Cong., 2d Sess. 55 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5468, 5504. In the proposing Committee's view, "the VA per diem payments should increase the resources available for furnishing of care to eligible veterans—not simply reduce the amount of Medicaid payments to the Homes." *Id.* at 56, 5505. This provision, however, was not enacted into law. *See* Senate/House Explanatory Statement of Compromise Agreement on H.R. 5299, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 5572, 5583.

"(b) *Social services.* Social services are not income if they are any of the following:

"(1) Assistance provided in cash or in kind (but not received in return for a service you perform) under any Federal, State, or local government program whose purpose is to provide social services including vocational rehabilitation (Example: Cash given you by the Department of Veterans Affairs to purchase aid and attendance);"

20 C.F.R. § 416.1103(b)(1).

The Department concedes that, under these regulations, aid and attendance allowances are not to be considered "income" for purposes of either the eligibility or post-eligibility determinations. *See Ginley v. White,* 1992 WL 17461 (E.D.Pa.1992) (aid and attendance allowance cannot be considered income at either eligibility or post-eligibility phase).[6] The Department has promulgated an administrative regulation that nevertheless allows aid and attendance allowances to be considered in the post-eligibility determination as "benefits" which must be applied to monthly medical expenses.

"5. Payments from any source, which are or may be received as a result of a medical expense or increased medical need, are not income. These payments include veterans administration aid and attendance and veterans administration reimbursements for unusual medical expenses.

"a. Veterans administration aid and attendance benefits must be considered as payments received in the months the benefit was intended to cover and must be applied to the medical expense incurred in those months; ..."

N.D.Adm.Code § 75–02–02.1–34(5)(a).

The Department contends that the aid and attendance allowances are third-party payments which must be considered under federal law and regulations. *See* 42 U.S.C.

§ 1396a(a)(25). One regulation requires applicants to apply for other benefits.

"(a) As a condition of eligibility, the agency must require applicants and recipients to take all necessary steps to obtain any annuities, pensions, retirement, and disability benefits to which they are entitled, unless they can show good cause for not doing so.

"(b) Annuities, pensions, retirement and disability benefits include, but are not limited to, veterans' compensation and pensions, OASDI benefits, railroad retirement benefits, and unemployment compensation."

42 C.F.R. § 435.608. Another requires an applicant to assign rights to benefits.

"(a) As a condition of eligibility, the agency must require legally able applicants and recipients to:

"(1) Assign rights to the Medicaid agency to medical support and to payment for medical care from any third party;

\*      \*      \*      \*      \*      \*

"(3) Cooperate in identifying and providing information to assist the Medicaid agency in pursuing third parties who may be liable to pay for care and services under the plan, unless the individual establishes good cause for not cooperating."

42 C.F.R. § 435.610(a)(1) and (3).

### V

Krueger asserts that the aid and attendance allowance is not a third-party payment and that to allow the Department to consider it as such would permit the Department to accomplish indirectly what it has been directly forbidden to do by the federal income regulations, and would defeat the purposes behind the community spouse monthly maintenance needs allowance and the Veterans Administration aid and attendance allowance. We disagree.

---

**6.** The Department had argued in the alternative to the trial court that *LaMore v. Ives,* 977 F.2d 713 (1st Cir.1992), authorized the differing treatment of the aid and attendance allowance as "income" for purposes of the post-eligibility determination. The Department abandoned this argument on appeal. Counsel for Krueger has informed us that on June 24, 1994, HCFA State Medicaid Manual § 3701.2 was changed by the federal Department of Health and Human Services to delete the requirement that an aid and attendance allowance be counted as "income" for purposes of the post-eligibility determination.

Under the third-party liability payment scheme, a "third party" is broadly defined as "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan." 42 C.F.R. § 433.136(3). In *Sherman v. Griepentrog*, 775 F.Supp. 1383, 1394 (D.Nev.1991), the court ruled that Veterans Administration unusual medical expense ("UME") payments to Medicaid recipients could not be counted as "income" during the Medicaid post-eligibility stage of cost determination, and the court granted a permanent injunction to stop the practice.[7] Unlike aid and attendance allowances, UME payments are reimbursements to veterans for out-of-pocket unusual medical expenses which the veteran would not receive if the veteran had not previously disbursed funds for the medical care. *See Sherman*, 775 F.Supp. at 1392. After the court's ruling, the state of Idaho implemented a policy requiring UME beneficiaries to turn over their UME payments to the state Medicaid agency as third-party liability ("TPL") payments.

The court held that the new Idaho plan was in direct violation of the permanent injunction.

"When one considers why and how VA pensioners receive UME payments it quickly becomes apparent that the VA's UME payment program is not a 'third party.' VA pensioners receive UME payments as *reimbursement* for previously incurred *out-of-pocket* medical expenses. They do not receive the payments as reimbursement for *Medicaid* services.

"It seems obvious to the court that the TPL payment system was instituted for one very good reason: when a third party is legally liable to provide payment for a service that Medicaid has provided or will provide, Medicaid should not be forced to foot the entire bill. It is simply a contribution system whereby two or more legally responsible providers (or bill-payers) must split the costs of service. It furthers the Medicaid mandate of being only a payor of last resort.

"However, in the UME context, Medicaid is not a payor of any kind as it did not pay for any part of the service or care for which the VA UME was paid—the patient did. Why would the TPL payment scheme provide that the state agency could seek 'reimbursement' for services that *it did not pay for?* Obviously, it does not. Thus, a state cannot require a recipient to assign his or her UME check to the state."

*Edwards v. Griepentrog*, 804 F.Supp. 1310, 1312–1313 (D.Nev.1992) (footnotes omitted; emphasis in original).

■ Considering the nature of UME payments, we can see why the court refused to allow the agency to treat them as third-party liability payments. However, aid and attendance allowances are not a reimbursement for a veteran's out-of-pocket medical expenses. Instead, they are provided based on an assessment of the veteran's physical and medical need for them and, when the veteran is in need of, and in fact does receive, nursing home care, that care substitutes for the purpose for which the aid and attendance allowance was designed. When a veteran is in a nursing home, the aid and attendance allowance is paid to cover the exact same services being paid for by the Medicaid program. *Compare Edwards*, 804 F.Supp. at 1312–1313 n. 5 (to the extent that a UME payment is given for services actually provided for by Medicaid it is outside the scope of relief of the court's order). We therefore conclude that, when a veteran is receiving nursing home care, the Veterans Administration aid and attendance allowance program is a "third party" obligated to pay for those Medicaid-rendered services.

Krueger asserts there is no requirement that the aid and attendance allowance be used to purchase aid and attendance that is medical in nature. In *Klapak v. Blum*, 97 A.D.2d 764, 468 N.Y.S.2d 182, 183 (1983), the court, addressing a "new contention" on appeal, refused to consider the aid and attendance allowance as a liability of a third party

---

7. Several courts have ruled that UME payments cannot be considered as "income." *See, e.g., Summy v. Schweiker*, 688 F.2d 1233 (9th Cir. 1982); *Inman v. Sullivan*, 809 F.Supp. 659 (S.D.Ind.1992); *Mitson By and Through Jones v. Coler*, 674 F.Supp. 851 (S.D.Fla.1987); *Peffers v. Bowman*, 599 F.Supp. 353 (D.Idaho 1984).

to pay for services that Medicaid would otherwise have to pay for because 38 U.S.C. § 1502(b) did not state that aid and attendance could only be granted for services medical in nature.

We find *Klapak* of questionable authority for two reasons. First, the Court of Appeals of New York affirmed that decision without addressing the issue because the "issue argued on appeal, not having been considered by the administrative agency in making its determination, may not be reviewed by this Court." *Klapak v. Blum*, 65 N.Y.2d 670, 491 N.Y.S.2d 615, 481 N.E.2d 247 (1985). Second, although there is no express statutory requirement that the aid and attendance allowance be used for medical purposes, it is apparent that the Veterans Administration views aid and attendance allowances as medically related during institutionalization because it discontinues the allowance as duplicative during a veteran's extended hospitalization in a Veterans Administration facility. *See* 38 U.S.C. § 5503(e).

We also find that the Department's policy of treating the aid and attendance allowance as a third-party liability does not thwart the policies underlying the community spouse minimum monthly maintenance needs allowance. As we have noted, a community spouse is not entitled to a cash grant to bring the combined income of both spouses to the minimum monthly maintenance needs allowance level. Rather, the institutionalized spouse may only transfer such income to the extent that that income is made available to the community spouse. The aid and attendance allowance is not viewed as "income," but is intended to cover an institutionalized recipient's medical care. There are other avenues for increasing income to reach the community spouse's minimum monthly maintenance needs allowance amount, *see, e.g.*, 42 U.S.C. § 1396r–5(e)(2); N.D.Adm.Code § 75–02–02.1–24(7)(e), which do not require a construction of the law allowing for diversion of a medical allowance intended for an institutionalized spouse.

Moreover, the Department's policy treating aid and attendance allowances as third-party liability payments comports with the principle that " 'Medicaid is intended to be

the payer of last resort, that is, other available resources must be used before Medicaid pays for the care of an individual enrolled in the Medicaid program.' " *New York State Dept. of Social Services v. Bowen*, 846 F.2d 129, 133 (2nd Cir.1988) (quoting S.Rep. No. 146, 99th Cong., 2d Sess. 1, 312, *reprinted in* 1986 U.S.C.C.A.N. 42, 279). *See also In Interest of McMullen*, 470 N.W.2d 196, 201 (N.D.1991) ("the regulations on welfare eligibility reflect a basic social policy that welfare recipients must use their own available income and resources before shifting the burden of their support to the taxpayers").

■ We conclude that the Department's treatment of Krueger's aid and attendance allowance as a third-party liability under N.D.Adm.Code § 75–02–02.1–34(5)(a) does *not conflict with federal law or regulations.* The judgment is reversed and the Department's decision is affirmed.

VANDE WALLE, C.J., and LEVINE and SANDSTROM, JJ., concur.

MESCHKE, Justice, concurring.

Because I understand Justice Neumann's well-written opinion for the court holds that "the Department's policy of treating [this veteran's] aid and attendance allowance as a third-party liability does not thwart ... the community spouse minimum monthly maintenance needs allowance," as that allowance is carefully recognized in part II of the opinion, I join in the opinion and result. To the extent that this veteran can make his income and resources available to his community spouse, the federal Medicare Catastrophic Coverage Act mandates his opportunity to do so as directed in 42 U.S.C. § 1396r–5.