**Mildred LIND, Appellant,**

v.

**WELLS COUNTY SOCIAL SERVICE BOARD and Social Service Board of North Dakota, Appellees.**

**Civ. No. 10021.**

Supreme Court of North Dakota.

Oct. 23, 1981.

Monte Engel, Legal Assistance of N.D., Devils Lake, for appellant; argued by Monte Engel, Devils Lake.

Blaine L. Nordwall, Asst. Atty. Gen., Social Service Board of N.D., Bismarck, for appellees; argued by Blaine L. Nordwall, Asst. Atty. Gen., Bismarck.

VANDE WALLE, Justice.

This is an appeal by Mildred Lind from the judgment of the District Court of Wells County, dated April 3, 1981, upholding a determination of the Social Service Board of North Dakota to terminate Mildred's intermediate care benefits under the Medicaid Program. We affirm.

Mildred is an 81-year old widow who, at all times pertinent to this case, has been eligible for and a recipient of Medical Assistance Benefits under the Medicaid Program. On June 5, 1979, Mildred was transferred from the Sheridan Memorial Home, Inc., which is a basic care facility located at McClusky, North Dakota, to the St. Aloisius Hospital—Intermediate Care Facility located at Harvey, North Dakota where she is currently a resident. At the time of Mildred's admission to St. Aloisius she was diagnosed as suffering from hypertension, senile dementia, and bilateral cataracts.

While residing at the Sheridan Memorial Home, Inc., it is undisputed that Mildred would often refuse to take the medication prescribed for her senile dementia and hypertension conditions and that, as a conse-

quence, she would often be in a confused state of mind and suffer from greatly elevated blood pressure. Mildred's attending physician, Dr. B. F. Addy, referring to the period during which Mildred was residing at the Sheridan Memorial Home, Inc., described her as posing problems to staff, other residents, and herself. More specifically Dr. Addy stated that Mildred was in a confused state with high blood pressure because she refused to take her medication. He also reported that she would hallucinate, she would refuse to attend activities at the home, and she was paranoic—believing that she was being poisoned.

Subsequent to her transfer to St. Aloisius Mildred has had successful cataract surgery and, in the words of Dr. Addy, "she has taken her medications, is not in a confused state of mind, her blood pressure has remained down, and she has adjusted quite well socially."

The Devils Lake Area Screening Team, a decision making unit of the Social Service Board of North Dakota, determined on March 25, 1980, that Mildred's needs could be met by a basic level care and that continued intermediate care benefits were unnecessary. On May 1, 1980, the State Screening and Utilization Review Team, having reviewed the Area Screening Team's decision at the request of Mrs. Art Emerson, Mildred's daughter, upheld the decision to terminate Mildred's intermediate care benefits. Mildred appealed the State Screening Team's decision to the Social Service Board which on October 16, 1980, entered its decision upholding the determination to terminate Mildred's intermediate care assistance. That decision was appealed by Mildred to the District Court of Wells County and was upheld by that court.

On appeal to this Court from the district court's judgment Mildred has raised the following issues:

(1) Whether or not the Social Service Board provided timely and adequate notice as required by the federal regulations and by due process concepts;

(2) Whether or not the following federal regulations were violated during the process by which it was determined that Mildred was no longer qualified for intermediate care benefits:

(a) physician participation requirements of 42 C.F.R. §§ 456.401(b)(2)(i) and 456.405 (1980);

(b) evaluation requirements of 42 C.F.R. §§ 456.370 and 456.372 (1980);

(c) written criteria requirement of 42 C.F.R. § 456.432 (1980);

(3) Whether or not consideration was given to the attending physician's opinion as required by 42 C.F.R. §§ 440.150(e) and 456.436 (1980); and

(4) Whether or not the Social Service Board's decision was supported by a preponderance of the evidence.

A brief explanation of the statutory and regulatory framework for the Medicaid Program will provide a useful background for discussing the issues raised by Mildred. Title XIX of the Social Security Act establishes the Medicaid Program. 42 U.S.C. § 1396 (1980), *et seq.* This is a cooperative federal-state program designed to provide medical assistance to individuals in need of it. Although a state is not required to participate, if it chooses to do so it must develop a plan which conforms to the federal guidelines. Upon receiving approval of the state plan by the Secretary of Health and Human Services the state receives reimbursement for a portion of the funds it expends to provide medical assistance for eligible persons under the Medicaid Program. North Dakota's state plan has received federal approval.

Each participating state must designate an agency to administer the medical assistance program, and North Dakota has designated the Social Service Board of North Dakota to fulfill that function. Subsection 1 of Section 50–06–05.1, N.D.C.C.; Chapter 50–24.1, N.D.C.C. In administering the medical assistance program the Social Service Board must follow the directives of Title XIX of the Social Security Act (42 U.S.C. § 1396 (1980), *et seq.*); the federal regulations promulgated by authority of Title XIX (42 C.F.R., parts 430 through 456); Chapter 50–24.1, N.D.C.C.; and Chapter

75–02 of the North Dakota Administrative Code.

For qualifying persons the Medicaid Program pays for skilled nursing care in a skilled nursing facility and also for intermediate care provided by an intermediate care facility. The Medicaid Program does not pay for basic care, but financial assistance is available to individuals needing such care through the cooperative efforts of the State Social Service Board and the County Social Service Boards under Chapter 50–01, N.D. C.C.

Under 42 C.F.R. § 456.431(a) (1980) each recipient's need to continue receiving intermediate care benefits must be reviewed at least every six months. Pursuant to this requirement, Mildred's need for continued intermediate care benefits was reviewed by the Devils Lake Area Screening Team, and by notice dated April 3, 1980, she was informed of the team's decision that she not continue to receive such benefits. The State Screening Team reviewed the case, pursuant to 42 C.F.R. § 456.436(e) (1980), and affirmed the Area Team's decision. A notice, dated May 1, 1980, was sent to Mildred informing her of the State Screening Team's decision and stating that its effective date was April 22, 1980. An appeal of the State Screening Team's decision was taken before the State Social Service Board, and by agreement of the parties was submitted on briefs, affidavits, and other documents without benefit of an oral hearing.[1] The Social Service Board entered its decision on October 16, 1980, upholding the decision of the State Screening Team to terminate intermediate care benefits for Mildred.

■ Mildred asserts that the notices provided by the Area and State Screening Teams were untimely and were inadequate in that they failed to include a statement of what action was to be taken, the reasons for the action, the specific regulations supporting the action, and the circumstances under which assistance would be continued if a hearing was requested. She also asserts that the Social Service Board's notice of its decision did not comply with 42 C.F.R. §§ 456.437 and 456.438 (1980) which specify to whom notice of any adverse decision is to be sent and that such notice is to be given not less than two days after the date of the decision.

Mildred concedes, however, that none of the alleged violations of notice resulted in any harm to her. Intermediate care benefits were paid for her by the Medicaid Program until the Social Service Board entered its final decision on October 16, 1980. Mildred's case was reviewed by the State Screening Team and the State Social Service Board, subsequent to which she has received judicial review of the Social Service Board decision by the district court and now by this Court on appeal from the district court's judgment. In view of the fact that Mildred concedes she has incurred no harm by the alleged notice violations we conclude that it is neither necessary nor appropriate for us to reach a determination of this issue.

Mildred asserts that the process by which it was determined that she should no longer continue to receive intermediate care benefits was in violation of a number of federal regulations.

■ She asserts that no physician participated in the decision of the Area Screening Team as is required by 42 C.F.R. § 456.-406(b)(1) (1980), which provides:

> We do not consider this matter properly before us because Mildred was informed, as part of the May 1, 1980 notice of the State Screening Team decision, that she was entitled to a fair hearing before the Social Service Board and her case was, in fact, reviewed by the Board. Accordingly, we make no determination today as to whether or not the Social Service Board must permit a fair hearing for continued stay cases such as this.

---

1. The Social Service Board contends that, with regard to the utilization review process to determine whether or not an individual needs continued intermediate care services, neither the federal regulations nor due process concepts require that the individual be given a "fair hearing" before the Social Service Board. Mildred asserts that as a matter of due process a fair hearing before the Board is required, and she cites the case of *Yaretsky v. Blum*, 629 F.2d 817 (2nd Cir. 1980) in support of her position.

"(b) UR [Utilization Review] must be performed using a method specified under § 456.401(b) by a group of professional personnel that includes—

(1) At least one physician;"

The Social Service Board asserts that a physician, Dr. P. Roy Gregware, participates as a member on both the Area and the State Screening Teams. Dr. Gregware's signature appears on the Area Screening Team's decision form indicating that he approved the decision to terminate Mildred's intermediate care benefits, but his affidavit of August 6, 1980, while stating that he is a physician member of the State Screening Team, does not indicate that he is a member of any Area Screening Team. We do not believe it is necessary to ascertain whether or not Dr. Gregware is a member of the Area Screening Team, because we disagree with Mildred's assertion that the federal regulations require a physician to participate in the initial utilization review decision. The Section relied upon by Mildred is contained under Subpart F of Chapter 4, Title 42, of the Code of Federal Regulations dealing with the control of utilization of intermediate care facility services. 42 C.F.R. § 456.431(a) (1980), which is also contained under this Subpart, provides that each recipient's need to continue receiving intermediate care must be reviewed at least every six months. Although 42 C.F.R. § 456.406(b)(1) (1980) states that utilization review must be performed by a group including one physician, 42 C.F.R. § 456.436(a)(2) (1980), provides that utilization review may be performed by "a designee of the UR group." There is no requirement that such designee be a physician. In the event that the UR group or its designee determines that an individual does not need continued intermediate care, 42 C.F.R. § 456.436(e) (1980) provides that there must then be a review of the case by "the group or a subgroup that includes at least one physician." The state plan developed by North Dakota attempts to comply with these federal regulations by having the initial utilization review conducted by an Area Screening Team or its designee and, in the event that a decision is made to discontinue intermediate care benefits, the case is reviewed, as required by 42 C.F.R. § 456.-436(e) (1980), by the State Screening Team which does include a physician. We conclude that the participation of a physician on the State Screening Team's review of the case constitutes compliance with the federal regulations in this regard.

Mildred asserts that the decision to terminate her intermediate care benefits was made without appropriate evaluation procedures as required under 42 C.F.R. §§ 456.370 and 456.372 (1980). Upon reviewing those regulations we conclude that they pertain only to an evaluation made prior to an applicant's admission to an intermediate care facility or prior to authorization for intermediate care payments and that they do not apply to this case which involves a determination of the need for continued stay in an intermediate care facility.

Mildred asserts that the Social Service Board has failed to develop adequate written criteria to satisfy the requirement of 42 C.F.R. § 456.432(a) (1980):

"The UR plan must provide that—

(a) The group performing UR develops written criteria to assess the need for continued stay."

Subsection 75–02–02–09(6) of the North Dakota Administrative Code provides a list of intermediate nursing functions to be used as criteria in determining eligibility for intermediate nursing care under the medical assistance program. This same list of intermediate nursing functions is also found in the "Guidelines for Patient Review" which is used for making a determination of whether or not an individual needs continued intermediate care services. Mildred asserts that these criteria are inadequate because they do not state which or how many of these functions must be satisfied to justify a determination that continuation of intermediate care services is necessary. We conclude that this list of functions for reviewing a patient's continued need for intermediate care services meets the requirement of 42 C.F.R. § 456.432(a) (1980).

We agree that the written criteria do not establish how many functions or which functions must be satisfied for a determination to be made that continued intermediate care is needed, but we do not believe that the criteria are, for that reason, insufficient to satisfy the federal regulation. The reviewing group, using the list of intermediate nursing functions, must make a judgment as to whether or not the individual involved is in need of intermediate nursing care. That judgment cannot be made by the use of a mathematical formula nor by merely adding together a set number of applicable criteria. We conclude that the written criteria established by the Social Service Board to assess the need for continued receipt of intermediate care benefits meets the requirement of 42 C.F.R. § 456.-432(a) (1980).

██ Mildred asserts that the Social Service Board failed to consider her attending physician's opinion as required by 42 C.F.R. § 440.150(e) (1980), which states:

"(e) If a State includes as intermediate care facility services those services provided by a distinct part of a facility other than an intermediate care facility, it may not require transfer of a recipient within or between facilities if, in the opinion of the attending physician, it might be harmful to the physical or mental health of the recipient."

We conclude that the foregoing regulation does not apply to cases involving an intermediate care facility. By its express terms the regulation relates to cases involving intermediate care services provided by a facility other than an intermediate care facility. Consequently, that provision has no application to this case.

██ Mildred asserts that the decision to terminate her intermediate care benefits was made in violation of the following relevant portions of 42 C.F.R. § 456.436 (1980) regarding notification to the attending physician and consideration of the attending physician's opinion:

"(e) If the group [UR group] or its designee finds that a continued stay case does not meet the criteria, the group or a subgroup that includes at least one physician reviews the case to decide the need for continued stay;

(f) If the group or subgroup making the review under paragraph (e) of this section finds that a continued stay is not needed, it notifies he [the] recipient's attending physician or, in institutions for the mentally retarded, the recipient's qualified mental retardation professional, within 1 working day of its decision, and gives him 2 working days from the notification date to present his views before it makes a final decision on the need for the continued stay;

(g) If the attending physician or qualified mental retardation professional does not present additional information or clarification of the need for the continued stay, the decision of the UR group is final;

(h) If the attending physician or qualified mental retardation professional presents additional information or clarification, the need for continued stay is reviewed by—

(1) The physician member(s) of the UR group, in cases involving a medical determination; or

(2) The UR group, in cases not involving a medical determination; and

(i) If the individuals performing the review under paragraph (h) of this section finds that the recipient no longer needs ICF services, their decision is final."

Pursuant to the foregoing regulation the utilization review group or a subgroup including at least one physician must determine the need for continued intermediate care. If the group or subgroup determines that such care is unnecessary it must notify the attending physician within one working day of the decision and give him two working days from the date of the notification to present his views prior to entering a final decision on the need for continued intermediate care.

Mildred's need for continued intermediate care was initially assessed by an Area

Screening Team. Her case was then reviewed by the State Screening Team. Irrespective of whether or not Dr. Gregware is a member of the Area Screening Team, it is undisputed that Mildred's case was reviewed by the State Screening Team which includes Dr. Gregware as a member. Therefore, her case was reviewed by a "group or a subgroup that includes at least one physician" as required by 42 C.F.R. § 456.436(e) (1980).

Mildred's attending physician, Dr. B. F. Addy, was notified on April 3, 1980, of the Area Screening Team's decision to terminate her intermediate care benefits, and the notification included a statement that the effective date of the decision was April 1, 1980. It is undisputed, however, that her benefits were not terminated until October 16, 1980, after both the State Screening Team and the Social Service Board had reviewed the case. It is also undisputed that both the State Screening Team and the Social Service Board had Dr. Addy's views before them at the time they made their decisions. Consequently, we conclude that the attending physician notification requirement under 42 C.F.R. § 456.436(f) (1980) was met by the utilization review process followed in Mildred's case.

Mildred asserts that the Social Service Board's decision should be reversed because it is not supported by a preponderance of the evidence. Section 28–32–19, N.D.C.C., provides in relevant part:

"... the court shall affirm the decision of the agency unless it shall find that any of the following are present:

\*     \*     \*     \*     \*     \*

"5.  The findings of fact made by the agency are not supported by a preponderance of the evidence...."

With regard to this Court's review of agency fact findings using the preponderance standard of Section 28–32–19, N.D.C.C., we stated in *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214 (N.D.1979):

"In construing the 'preponderance of the evidence' standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." 283 N.W.2d at 220.

Upon reviewing the record in this case, we conclude that a reasoning mind could have found, as did the Board, that Mildred did not need continued intermediate care.

At the time Mildred entered the St. Aloisius intermediate care facility her undisputed diagnosis was that she was suffering from bilateral cataracts, hypertension, and senile dementia. There is evidence in the record that subsequent to entering St. Aloisius Mildred has undergone successful cataract surgery leaving her vision much improved. There is also evidence that she has been taking her prescribed medications and as a result has been doing well from both a mental and physical standpoint. There is also evidence that she is capable of taking care of her own daily personal needs with the exception of needing oral medication administered to her and needing her blood pressure monitored.

Mildred asserts, and her assertion is supported by the opinion of her attending physician, that in order to continue doing well from a medical standpoint she must remain in intermediate care, because, without such care, she would not continue to take her medication as prescribed. The Social Service Board has taken the view that Mildred's needs can be met by a basic care facility. We cannot conclude, contrary to the determination of the Board, that if, as a result of the termination of Mildred's intermediate care benefits, she transfers to a basic care facility she will refuse to take her medications against the advice of both her doctor and the personnel at the basic care facility. This is the type of determination on which this Court cannot and will not substitute its judgment for that of the Board. A reasoning mind could have determined that the greater weight of the evi-

dence is that Mildred does not need intermediate care services. Accordingly, we conclude that the determination of the Social Service Board is supported by a preponderance of the evidence.

In accordance with the foregoing opinion, we affirm the judgment of the district court upholding the October 16, 1980, decision of the Social Service Board. Judgment affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.