1998 ND 48

**Lois WAHL, surviving spouse of Harold Wahl, deceased, and Dennis Wahl, Personal Representative of the Estate of Harold Wahl, deceased, Plaintiffs and Appellants,**

v.

**MORTON COUNTY SOCIAL SERVICES and North Dakota Department of Human Services, Defendants and Appellees.**

Civil No. 970248.

Supreme Court of North Dakota.

March 5, 1998.

Rehearing Denied March 30, 1998.

Gregory C. Larson, of Wheeler Wolf, Bismarck, for plaintiffs and appellants. Appearance by Melissa Hauer.

Jean R. Mullen, Assistant Attorney General, Attorney General's Office, Bismarck, for defendants and appellees.

SANDSTROM, Justice.

[¶ 1] Lois Wahl and her son, Dennis Wahl, personal representative of the estate of Harold Wahl (the Estate), appealed from a judgment affirming the Department of Human Services' denial of Harold Wahl's request for medicaid benefits. We hold the Department properly determined Lois Wahl's assets exceed the spousal allowance, making Harold Wahl ineligible for benefits, and we affirm.

I

[¶ 2] Harold and Lois Wahl were married and owned a farm near Tuttle. Harold Wahl suffered a heart attack and stroke and entered a nursing home in December 1994. He applied to Morton County Social Services for medicaid benefits in May 1995, but his application was denied. He again applied for benefits in August 1995. His application was again denied, because Lois Wahl's assets exceeded the amount allowable for Harold Wahl to receive medicaid benefits. On November 1, 1995, the Wahls appealed the denial of benefits and requested a fair hearing. An administrative hearing was held on January 4, 1996, with additional proceedings held on January 25, 1996, and March 25, 1996. Upon completion of the hearing, the administrative law judge recommended denial of benefits. The Department adopted the recommendation and denied benefits. The Wahls appealed from the Department's order to the district court. Harold Wahl died pending the appeal, and the Estate was substituted as a party plaintiff. After a hearing, the district court entered a judgment upholding the Department's denial of benefits. Lois Wahl and the Estate appealed.

[¶ 3] The district court had jurisdiction under N.D. Const. Art. VI, § 8, and N.D.C.C. § 28–32–15(3). The appeal to this Court was timely filed under N.D.C.C. § 28–32–21 and N.D.R.App.P. 4(a). This Court has jurisdiction under N.D. Const. Art. VI, § 6, and N.D.C.C. § 28–32–21.

II

[¶ 4] When an administrative agency decision is appealed from the district court to this Court, we review the decision of the agency, not the decision of the district court. *Walton v. N.D. Dept. of Human Services,* 552 N.W.2d 336, 338 (N.D.1996). Under N.D.C.C. §§ 28–32–19 and 28–32–21, we determine whether the agency's findings of fact are supported by a preponderance of the evidence, whether its conclusions of law are supported by its findings of fact, and whether its decision is in accordance with the law. *Walton.* In determining whether the agency's findings of fact are supported by a preponderance of the evidence, we do not make independent findings of fact or substitute our judgment for that of the agency, but determine whether a reasoning mind could have reasonably determined the factual conclusions were supported by the weight of the evidence. *Walton; Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979). The agency's decisions on questions of law are fully reviewable by this court. *Walton* at 338.

## III

■ [¶ 5] Lois Wahl and the Estate assert Lois and Harold Wahl were denied due process, because the Department did not hold the "fair hearing" within 30 days after the request for a hearing. Under both the federal and state medicaid provisions, the agency must provide a hearing within 30 days of the request. 42 U.S.C. § 1396r–5(e)(2); N.D. Admin. Code § 75–02–02.1–24(7)(c). The hearing in this case was begun 64 days after the Wahls requested a hearing. The hearing officer found Wahls' attorney agreed to the scheduled hearing date and waived the timeliness issue. There is no record evidence either verifying or refuting the hearing officer's finding on this issue. Neither is there, however, any showing the Wahls objected to the delay or complained of prejudice resulting from the delay. The continuance of the hearing from January 4, 1996, to two later dates was, at least in part, to accommodate the Wahls in presenting their case.

■ [¶ 6] We certainly do not condone the Department's failure to provide a hearing within the statutory timeframe. Due process generally requires a person be given notice and an opportunity to be heard before the government deprives the person of property. *State v. One Black 1989 Cadillac,* 522 N.W.2d 457, 463 (N.D.1994). However, due process is flexible and must be analyzed on a case-by-case basis, balancing the competing interests and assessing whether the basic due process requirement of fairness has been satisfied. *One Black 1989 Cadillac.* Sanctions for delay in administrative proceedings are generally warranted only when a party has shown substantial prejudice by the delay. *See, e.g., Hickey v. N.D. Dept. of Health,* 536 N.W.2d 370, 372 (N.D.1995). The Wahls have not demonstrated substantial prejudice, and we conclude, therefore, they were not denied due process by the Department's failure to hold the hearing within 30 days after the request for hearing.

## IV

■ [¶ 7] Lois Wahl and the Estate also assert Lois and Harold Wahl were denied due process because the notice of denial of benefits was defective. The Department concedes the initial notice did not include the required notice to the Wahls of their right to address at the hearing the Department's computed community spouse monthly income and accountable asset allowances. *See* 42 U.S.C. § 1396r–5(e)(1); N.D. Admin. Code § 75–02–02.1–24(7)(a). However, the Department contends the notice was supplemented[1] at the beginning of the hearing to include all required information and the Wahls were not prejudiced by the defective notice because they had full opportunity at the hearing to address all relevant issues.

■ [¶ 8] Issues regarding the community spouse income and asset allowances were fully addressed at the hearing. Due process prescribes a participant in an administrative proceeding be given notice of the general nature of the questions to be heard and an opportunity to prepare and be heard on those questions, and notice is adequate if it apprises the party of the nature of the proceedings so there is no unfair surprise. *Estate of Robertson v. Cass Co. Social Services,* 492 N.W.2d 599, 602 (N.D.1992). If a party cannot demonstrate prejudice resulting from an allegedly defective notice, there is generally no right to redress. *See Lind v. Wells Co. Social Service Bd.,* 311 N.W.2d 547, 550 (N.D.1981). The Wahls have failed to demonstrate harm resulting from the initial defective notice, and we, therefore, conclude they did not suffer a violation of their due process rights. *See State v. Hass,* 264 N.W.2d 464, 467 (N.D.1978).

## V

■ [¶ 9] Lois Wahl and the Estate assert the Department wrongly determined the value of Lois Wahl's assets exceed the maximum allowed for Harold Wahl to qualify for medicaid benefits. They claim the Department should have used net, rather than gross, unearned income for determining Lois Wahl's monthly income needs which, in turn, would have entitled her to retain additional

---

1. N.D. Admin.Code § 75–01–03–08(11) provides any notice subject to a request for "fair hearing" may be supplemented at any time before the conclusion of the hearing, and the supplemental information must be considered in determining the adequacy of the notice unless the claimant shows prejudice by that consideration.

assets while qualifying Harold Wahl for medicaid benefits. To fully explain this issue, we briefly summarize the Medicaid program and the rules for qualifying for medicaid benefits.

[¶ 10] The Medicaid program was enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* as a jointly financed federal and state program designed to provide health care to needy individuals. A state is not required to participate in the Medicaid program, but if a state elects to participate, the federal government shares the cost if the state's plan complies with the requirements of the Act and the related regulations of the Secretary of Health and Human Services. 42 U.S.C. § 1396a.

[¶ 11] *Estate of Krueger v. Richland Co. Social Services,* 526 N.W.2d 456, 458–459 (N.D.1994), cogently explained the coverage and qualification requirements of the program:

"Determining an applicant's participation in the program involves a two-phase process: first, determining medical eligibility and financial eligibility based on the applicant's income and resources; and second, determining the extent of assistance to which the applicant is eligible based on another calculation of income....

"In 1988, Congress enacted the Medicare Catastrophic Coverage Act, 42 U.S.C. § 1396r–5, which was in part designed 'to ameliorate the financial hardship suffered by aging couples faced with the high cost of nursing home care.' ... The legislation defines an 'institutionalized spouse' as an individual who 'is in a medical institution or nursing facility' and 'is married to a spouse who is not in a medical institution or nursing facility....' 42 U.S.C. § 1396r–5(h)(1). A 'community spouse' is 'the spouse of an institutionalized spouse.' 42 U.S.C. § 1396r–5(h)(2). Under prior law, nearly all of a couple's assets had to be depleted before either one could satisfy Medicaid eligibility requirements, leaving inadequate resources and income to support the community spouse.... To avoid impoverishing the community spouse, the Act clarifies Medicaid income eligibility guidelines and provides a greater community spousal allowance, thus permitting 'the community spouse (usually the wife) to retain sufficient income and assets to live in the community without disqualifying the institutionalized spouse from eligibility for Medicaid.' ...

"A community spouse is permitted a 'resource allowance,' generally defined as one-half of the couple's countable total resources, or $60,000, a sum adjusted annually according to the consumer price index, whichever is less. 42 U.S.C. § 1396r–5(c) and (f)(2); N.D.Adm.Code § 75–02–02.1–24(3). A community spouse is also permitted a 'monthly income allowance,' that depends on the 'minimum monthly maintenance needs allowance,' a maximum sum of $1,500, inclusive of an excess shelter allowance, which is also subject to annual adjustment. 42 U.S.C. § 1396r–5(d)(1)(B), (d)(2), and (d)(3)(C); N.D.Adm.Code § 75–02–02.1–24(5)(b)(2). An institutionalized spouse is allowed to transfer whatever income the community spouse needs to bring that spouse's monthly income to the minimum monthly maintenance needs allowance.... 42 U.S.C. § 1396r–5(d)(1)(B) and (d)(2); N.D.Adm.Code § 75–02–02.1–24(5)(b)(2). If the income of the institutionalized spouse, combined with the income of the community spouse, is insufficient to reach the minimum monthly maintenance needs allowance, the community spouse is not entitled to a cash grant from the state to bring the combined income to that level, ... but instead may apply for an increase in the community spouse resource allowance to 'an amount adequate to provide such a minimum monthly maintenance needs allowance.' 42 U.S.C. § 1396r–5(e)(2)(C). *See also* N.D.Adm.Code § 75–02–02.1–24(7)(e)...." (Footnote omitted.)

[¶ 12] When Harold Wahl applied for medicaid benefits in 1995, Lois Wahl was allowed to retain assets of $74,820, as her community spouse resource allowance. 42 U.S.C. § 1396r–5(f)(2); N.D. Admin. Code § 75–02–02.1–24(2), (3). The Wahls own about 2,700 acres of farmland near Tuttle. It is appraised at $440,000 with a $270,000 mortgage on it. The Department concluded the Wahl's assets substantially exceeded the $74,820 community spouse asset allowance and the $3,000 asset allowance for Harold

Wahl as the institutionalized spouse. N.D. Admin. Code § 75–02–02.1–26.

. [¶ 13] In 1995, the minimum monthly maintenance needs allowance for Lois Wahl, as the community spouse, was $1,871 per month. 42 U.S.C. § 1396r–5(d)(3)(C); N.D. Admin. Code § 75–02–02.1–24(1)(d). At the "fair hearing" Lois Wahl argued she is entitled to a greater community spouse resource allowance, because her assets do not generate sufficient income to meet the $1,871 minimum monthly maintenance needs allowance. As we explained in *Krueger* at 459, if the community spouse resource allowance ($74,-820) does not generate sufficient income to provide the community spouse with the minimum monthly maintenance needs allowance ($1,871), the asset allowance must be increased to an amount which will generate that monthly income. N.D. Admin. Code § 75–02–02.1–24(7)(e).

[¶ 14] In 1995 the Wahls were renting about 1,000 acres of their farmland as pasture and received government payments for another 1,025 acres, which was set aside as part of the Conservation Reserve Program. The Wahl's 1994 tax return showed rent, gravel and program payments, and insurance proceeds from these acres of $61,704. About 227 acres were "in slough or hay" and the remaining 461 acres were farmed by their son, Dennis, under a crop share arrangement giving Dennis twenty-five percent of all farm income, with Harold and Lois Wahl responsible for paying all farm expenses.

[¶ 15] In determining Harold Wahl's medicaid eligibility, the Department used gross, rather than net, farm rental income. The Department concluded Lois Wahl's total monthly income was $2,606.90, well in excess of the community spouse resource allowance of $1,871 per month. Lois Wahl asserts the Department should have used net, instead of gross, farm rent. She claims her total monthly income, using net farm rent, is only $670.50. She asserts she is, therefore, entitled to an increased community spouse resource allowance sufficient to generate the $1,871 minimum monthly maintenance needs allowance. She claims the increased community spouse resource allowance would exceed the value of her assets, qualifying Harold Wahl for medicaid benefits.

[¶ 16] An applicant for medicaid benefits must prove eligibility. *Wagner v. Sheridan Co. Social Services Bd.*, 518 N.W.2d 724, 729 (N.D.1994). Under the Department's regulations, all "actually available" income is considered in establishing medicaid benefits. N.D. Admin. Code § 75–02–02.1–34(1),(2). Gross income includes unearned income. N.D. Admin. Code § 75–02–02.1–37(1). Net earned income is determined by adding net income from self-employment to other earned income, minus applicable deductions. N.D. Admin. Code § 75–02–02.1–38(1). The Department's rules also provide for specific deductions from both earned and unearned income. N.D. Admin. Code § 75–02–02.1–39. There is no provision, however, for deducting from unearned income the expenses incurred in obtaining that income.

[¶ 17] The Department explains unearned income most often does not involve expenses and, for simplicity and cost-effective operation of the program, the rules do not provide for calculating expenses in relation to unearned income. The United States Supreme Court observed in *Schweiker v. Gray Panthers*, 453 U.S. 34, 48, 101 S.Ct. 2633, 2642, 69 L.Ed.2d 460 (1981): "There are limited resources to spend on welfare. To require individual determinations of need would mandate costly factfinding procedures that would dissipate resources that could have been spent on the needy."

[¶ 18] The Department also reasons an applicant for benefits should not be allowed to select an asset generating expenses to offset income, thereby resulting in eligibility for benefits where none would otherwise exist. For example, an applicant could use assets to obtain a loan to purchase income-producing property with considerable annual expenses, including interest payments on the loan, which would offset the income and result in medicaid eligibility. The loan would eventually be paid off, and the applicant or his estate would own a valuable income-producing asset, even though the applicant received medicaid benefits during the years he was making loan payments. The Medicaid program is intended to be the payor of last resort, with other available resources being used before medicaid pays for

an individual's care. *Allen v. Wessman,* 542 N.W.2d 748, 752 (N.D.1996). "Public policy will not allow the social safety net for persons who are old, poor, and unfortunate to be exploited by those who are affluent." *Wessman* at 753.

■ [¶ 19] States electing to assist the medically needy must determine eligibility under standards that are reasonable and comparable for all groups. *Estate of Krueger v. Richland Co. Social Services,* 526 N.W.2d 456, 458 (N.D.1994); 42 U.S.C. § 1396a(a)(17). The Department's use of gross unearned income for determining eligibility is appropriate and reasonable. This application of the eligibility rules by the Department complies with both the letter and spirit of the Medicaid program, by requiring all available resources to be included in eligibility determinations.

## VI

■ [¶ 20] Lois Wahl and the Estate assert, even if the Department's use of gross, rather than net, unearned income for determining eligibility is reasonable and appropriate under the Department's rules, it is not permissible under federal law, because the Department cannot use more restrictive eligibility requirements than are used under the Supplemental Security Income program.[2]

[¶ 21] On petition for rehearing in *Hecker v. Stark Co. Social Service Bd.,* 527 N.W.2d 226, 237 (N.D.1994), we declared this issue to be an open question:

> "On petition for rehearing, the North Dakota Department of Human Services, relying on *Mowbray v. Kozlowski,* 914 F.2d 593 (4th Cir.1990), argues that North Dakota, as a § 209(b) state, may use eligibility criteria pertaining to 'medically needy' applicants for medicaid benefits which are more restrictive than those of the Supplemental Security Income (SSI) program....
>
> \*     \*     \*     \*     \*     \*
>
> "Full resolution of the effect of North Dakota's § 209(b) status on the validity of the Department's medicaid eligibility criteria can await another day when the answer

will directly affect the outcome of the parties' dispute."

[¶ 22] The congressional action underlying this issue was explained by the United States Supreme Court in *Schweiker v. Gray Panthers,* 453 U.S. at 38–39, 101 S.Ct. at 2637–2638:

> "In 1972, Congress replaced three of the four categorical assistance programs with a new program called Supplemental Security Income for the Aged, Blind, and Disabled (SSI), 42 U.S.C. § 1381 *et seq.,* Pub.L. 92–603, 86 Stat. 1465. Under SSI, the Federal Government displaced the States by assuming responsibility for both funding payments and setting standards of need. In some States the number of individuals eligible for SSI assistance was significantly larger than the number eligible under the earlier, state-run categorical need programs.
>
> "The expansion of general welfare accomplished by SSI portended increased Medicaid obligations for some States because Congress retained the requirement that all recipients of categorical welfare assistance—now SSI—were entitled to Medicaid. Congress feared that these States would withdraw from the cooperative Medicaid program rather than expand their Medicaid coverage in a manner commensurate with the expansion of categorical assistance. '[I]n order not·to impose a substantial fiscal burden on these States' or discourage them from participating, see S.Rep. No. 93–553, p. 56 (1973), Congress offered what has become known as the ' § 209(b) option.' Under it, States could elect to provide Medicaid assistance only to those individuals who would have been eligible under the state Medicaid plan in effect on January 1, 1972. States thus became either 'SSI States' or ' § 209(b) States' depending on the coverage that they offered." (Footnotes omitted.)

[¶ 23] Section 209(b), codified as 42 U.S.C. § 1396a(f), states in relevant part:

> "Notwithstanding any other provision of this subchapter, ... no State ... shall be

---

2. The relevant Supplemental Security Income regulation allows a deduction of "ordinary and necessary expenses" from payments received for

rent of real or personal property. 20 C.F.R. 416.1121(d).

required to provide medical assistance to any aged, blind, or disabled individual ... for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this subchapter and in effect on January 1, 1972, been in effect in such month...."

[¶ 24] In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act (TEFRA), amending the Medicaid Act and requiring a state plan for the medically needy must include a standard for determining income and resource eligibility and a methodology in determining such eligibility "which shall be the same methodology which would be employed under the supplemental security income program in the case of groups consisting of aged, blind, or disabled individuals in a State in which such program is in effect...." 42 U.S.C. 1396a(a)(10)(C)(i)(III).[3] The courts and the Health Care Refinancing Administration, the federal agency administrating the Medicaid Act, began to apply this provision to require states to use the same method for determining medicaid eligibility for the medically needy as the Supplemental Security Income program. In response, Congress passed a moratorium in 1984, and, in 1987, replaced the moratorium with an amendment to the Medicaid Act, codified at 42 U.S.C. § 1396a(r)(2):

> "The methodology to be employed in determining income and resource eligibility [in 209(b) states] ... may be less restrictive, and shall be no more restrictive than the methodology [used in the S.S.I. program]...."

This new provision created a tension with § 209(b) allowing states to use their 1972 medicaid eligibility regulations which were more restrictive than the Supplemental Security Income eligibility rules. In a well-reasoned opinion with extensive analysis of this issue, the United States Court of Appeals for the Fourth Circuit concluded in *Mowbray v. Kozlowski*, 914 F.2d 593, 601 (4th Cir.1990), § 209(b) was not repealed by the 1987 enactment, and § 209(b) states' medicaid eligibility requirements which are more restrictive than Supplemental Security Income program eligibility rules do not violate federal standards. Following the rationale of *Mowbray*, the United States Court of Appeals for the Seventh Circuit in *Cherry by Cherry v. Sullivan*, 30 F.3d 73, 75 (7th Cir.1994), also concluded § 209(b) states can utilize more restrictive medicaid eligibility requirements than are used by the Supplemental Security Income program. *See also McKoy v. North Carolina Dept. of Human Resources*, 101 N.C.App. 356, 399 S.E.2d 382, 385 (1991).

[¶ 25] There is no dispute North Dakota is a § 209(b) state.[4] Following the rationale of *Mowbray* and *Sullivan*, we hold the Department did not violate federal law in this case by using more restrictive medicaid eligibility requirements than are provided under the Supplemental Security Income program.

## VII

[¶ 26] Lois Wahl and the Estate also assert the Department cannot use gross, rather than net, unearned income in computing medicaid eligibility, because the Department has not demonstrated its pre–1972 eligibility regulations used gross, rather than net, unearned income.[5] The Wahls cite paragraphs seven and eight of Section 4, Chapter 318 of the Department's pre–1972 medical assis-

---

**3.** This provision was subsequently amended and now provides "which shall be no more restrictive than the methodology...."

**4.** In both *Hecker*, 527 N.W.2d at 237, and *Krueger*, 526 N.W.2d at 457, this Court recognized North Dakota is a § 209(b) state. *See also Schweiker v. Gray Panthers*, 453 U.S. 34, 39, n. 6, 101 S.Ct. 2633, 2638, n. 6, 69 L.Ed.2d 460 (recognizing North Dakota as one of 15 states which use the § 209(b) option).

**5.** Lois Wahl and the Estate assert the Department cannot use different systems of determining

medicaid eligibility for the medically needy and the categorically needy, citing *Winter v. Miller*, 676 F.2d 276 (7th Cir.1982) and cases cited therein. They assert if the 1972 plan used gross unearned income for determining eligibility for the medically needy, then the plan was "illegal" for treating the medically needy and the categorically needy differently. This argument is summarily made in their reply brief in which they make no attempt to demonstrate what particular eligibility provisions created "illegal" differential treatment of the two groups. Without more, we are unpersuaded their argument has merit.

tance plan, regarding treatment of income from rental properties:

"Par. 7. *Income from Real and Personal Property*—All cash returns from the sale or rental of real estate or personal property must be considered as available income. . . .

"Par. 8. *Income from Home Not Used by Recipient*—Recipients of assistance who find it necessary to move from their own home into other quarters, such as a boarding home, nursing home, or home for the aged, have a potential source of income available from the rental or sale of their home. The net income from rent after the expenses of ownership of the property have been deducted will be an income to be used by the recipient to meet his needs."

Paragraph seven requires "[a]ll cash returns" from real estate to be considered as available income in determining eligibility. Although paragraph eight allows deduction of ownership expenses from income in renting one's home or residence, it provides no basis for deducting expenses from rental income for any other type of property. We are unpersuaded the 1972 plan was less restrictive than the current plan or that under it the Department used net rather than gross unearned income to determine eligibility.

### VIII

 [¶ 27] The Department determined Lois Wahl's income and assets exceed her monthly income allowance and her community resource allowance, and, consequently, Harold Wahl was not eligible for medicaid benefits. We conclude the Bureau's findings are supported by a preponderance of the evidence, its conclusions are supported by its findings of fact, and its decision is in accordance with the law. Other issues raised by Lois Wahl and the Estate need not be addressed, because they are not necessary for resolving this appeal. Questions, the answers to which are not necessary to the determination of an appeal, need not be considered. *City of Fargo v. Ness,* 529 N.W.2d 572, 577 (N.D.1995). We, therefore, affirm the judgment of the district court upholding the Department's denial of Harold Wahl's application for medicaid benefits.

[¶ 28] VANDE WALLE, C.J., and NEUMANN and MARING, JJ., concur.

MESCHKE, Justice, concurring.

[¶ 29] Except for part VI, I join in the opinion by Justice Sandstrom and concur in the result. I believe part VI is inconsistent with part I of *Krueger Estate v. Richland County Soc. Serv.,* 526 N.W.2d 456, 457–58 (N.D.1994), and is unnecessary to our decision in this case.

[¶ 30] Herbert L. Meschke.