2005 ND 213

### In the Matter of the ESTATE OF Deloris PLADSON, Petitioner and Appellee

v.

### TRAILL COUNTY SOCIAL SERVICES and the Department of Human Services for the State of North Dakota, Respondents and Appellants.

No. 20050154.

Supreme Court of North Dakota.

Dec. 20, 2005.

Richard R. LeMay (argued) and Edward B. Reinhardt, Jr. (appeared), Legal Services of North Dakota, Minot, N.D., for petitioner and appellee.

Jean R. Mullen, Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for respondents and appellants.

VANDE WALLE, Chief Justice.

[¶ 1] The Department of Human Services appealed from a district court judgment reversing the Department's decision that Deloris Pladson was not eligible for Medicaid benefits because her countable assets, including a nonassignable annuity, exceeded the $3,000 eligibility limit, and from an order denying the Department's motion to alter or amend the court's judgment. We conclude the Department's finding that Pladson's estate failed to make a good-faith effort to sell the contractual right to receive money payments from the nonassignable annuity is not supported by a preponderance of the evidence. We affirm the district court's judgment and order.

I

[¶ 2] On July 21, 1988, Pladson, then age 62 and widowed, purchased a single premium deferred annuity from Lutheran Brotherhood. The annuity was annuitized through a "Supplementary Contract" with Lutheran Brotherhood dated April 25, 1995. The settlement provisions of the contract provided for a monthly income payment to Pladson of $645.98 beginning April 25, 1995, and ending March 25, 2010.

Pladson's daughter, Linda R. Erickson, was listed as the beneficiary on the contract. The contract allowed no withdrawals, had no surrender value, and further provided that "[t]his contract and any payments under it may not be assigned."

[¶ 3] On October 1, 1997, Pladson executed a durable power of attorney that appointed Erickson as her attorney in fact. Suffering from Alzheimer's disease, Pladson entered a Hatton nursing home in November 1997. While in the nursing home, Pladson received income of $540 per month from Social Security and $60 per day in nursing home insurance proceeds in addition to the monthly annuity payments.

[¶ 4] Pladson applied for Medicaid benefits on January 22, 2003. Traill County Social Services denied the application on May 6, 2003, because Pladson's assets were in excess of the $3,000 Medicaid limit. Traill County determined Pladson's countable assets totaled $48,057.81, an amount that included a $45,467.74 valuation for the annuity. Pladson appealed and an administrative hearing was held on August 18, 2003. After the Department learned the annuity was not assignable, the hearing was continued until the Department could reevaluate Pladson's eligibility. On September 5, 2003, the Department sent Pladson's attorney a letter informing her that the Department continued to consider the annuity, which was actuarially sound, an available asset for Medicaid purposes. The Department explained:

> While the annuity, by its terms, cannot be assigned, there is nothing in law to prevent Ms. Pladson from contracting to sell the payments she receives under the annuity.
>
> There is an active market for the sale and purchase of such "streams of income," referred to as the factoring transaction market. In this market,

sales and purchases are made of streams of income resulting from instruments such as structured settlement agreements, mortgage payments, lottery or casino winnings, estates, trusts, and annuities. I have enclosed, for your information, copies of printouts from websites for companies that purchase such streams of income, providing the individual with lump sum cash payments immediately. Neither the Department staff nor I have contacted any of these companies nor are we endorsing their services. These companies' websites are offered solely for purposes of illustrating the existence of the market.

Ms. Pladson is required to make a good faith effort to sell the income she has a right to receive under the annuity. She will not be eligible for Medicaid until she spends down the receipts from any such sale or shows that she is unable to make such a sale.

The letter included printouts of Internet websites for five factoring companies. Erickson contacted four of the five companies and faxed them copies of the "Supplementary Contract" for the annuity. Three of the four companies responded and declined Erickson's offer. The other company told Erickson there were "some legal problems" and had not made an offer to purchase at the time of the second administrative hearing.

[¶ 5] At the second administrative hearing on November 12, 2003, the Department took the position that the saleable fair market value of the stream of income from Pladson's annuity, more likely than not, exceeded $429.93, which is the difference between the $3,000 Medicaid asset limit and Pladson's other assets excluding the originally estimated annuity value of $45,467.74. The focus of the hearing was whether Pladson, through Erickson, had made a good-faith effort to sell the stream of payments from the annuity. Pladson died on November 22, 2003, and Erickson, as the personal representative of Pladson's estate, continued the appeal.

[¶ 6] The Administrative Law Judge ("ALJ") determined that Pladson was not eligible for Medicaid benefits because Pladson's total countable assets, including the annuity, exceeded the maximum asset limit of $3,000. The ALJ determined that Erickson erroneously offered to sell to the companies provided to her by the Department the annuity contract itself, which was not assignable, rather than the stream of income from the annuity. According to the ALJ, the companies "may have considered the matter differently had Ms. Erickson offered to write a separate contract for the sale of the stream of income from the annuity at a price equal to 75% of fair market value." The ALJ ruled "[t]he preponderance of the evidence shows that Ms. Erickson, on behalf of Ms. Pladson, failed to show that she made a good faith effort to sell her asset, the contractual right to receive money payments." The ALJ further ruled "it is entirely reasonable to conclude the value of the contract would have exceeded $3,000," and "[t]herefore, having an exact valuation of the annuity would not have changed the outcome of the determination that the annuity was an available asset or the eligibility determination." The Department adopted the ALJ's recommendations, and the estate appealed.

[¶ 7] The district court reversed the Department's decision, concluding among other things, there was no support in the record that there was "a factor's market for the particular annuity or stream of income from the annuity in question." The court also ruled the ALJ erred in finding Pladson failed to make a good-faith effort to sell the income stream from the annuity and in finding the stream of income from the annuity had any value.

The court denied the Department's motion to alter or amend its judgment reversing the Department's decision.

## II

[¶ 8] The dispositive issue in this case is whether the Department's finding that Erickson failed to make a good-faith effort to sell the stream of income from Pladson's annuity is supported by a preponderance of the evidence.

[¶ 9] When a decision of an administrative agency is appealed from district court to this Court, we review the decision of the agency rather than the decision of the district court. *Martin v. Stutsman County Soc. Servs.*, 2005 ND 117, ¶ 8, 698 N.W.2d 278. Nevertheless, a district court's analysis of an appeal from a decision by an administrative agency is entitled to respect if the court's reasoning is sound. *Sutherland v. North Dakota Dep't of Human Servs.*, 2004 ND 212, ¶ 6, 689 N.W.2d 880. Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm an administrative agency decision unless one of the following is present:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

In reviewing an administrative agency's findings of fact, we do not make independent findings of fact or substitute our judgment for that of the agency, but we determine only whether a reasoning mind reasonably could have determined the agency's factual conclusions were supported by the weight of the evidence from the entire record. *Roberts v. North Dakota Dept. of Human Servs.*, 2005 ND 50, ¶ 6, 692 N.W.2d 922. An administrative agency's decisions on questions of law are fully reviewable. *Martin*, at ¶ 8.

[¶ 10] Generally, a person without sufficient assets to meet the cost of necessary medical care and services is eligible for Medicaid benefits. *Schmidt v. Ward County Soc. Servs. Bd.*, 2001 ND 169, ¶ 9, 634 N.W.2d 506. The Medicaid program is intended to be a payor of last resort, and available resources must be exhausted before Medicaid will pay for an individual's care. *Wahl v. Morton County Soc. Servs.*, 1998 ND 48, ¶ 18, 574 N.W.2d 859. An applicant for Medicaid benefits must prove eligibility. *Roberts*, 2005 ND 50, ¶ 7, 692 N.W.2d 922. Under the Department's rules for determining Medicaid eligibility, a one-person unit is eligible for Medicaid benefits if the total value of that person's assets does not exceed $3,000. N.D. Admin. Code § 75–02–02.1–26(1)(a); *Linser v. Office of Attorney General*, 2003 ND 195, ¶ 7, 672 N.W.2d 643. An "asset" is defined as "any kind of property or property interest, whether real, personal,

or mixed, whether liquid or illiquid, and whether or not presently vested with possessory rights." N.D. Admin. Code § 75–02–02.1–01(2). Although certain assets are exempt or excluded from consideration, *see* N.D. Admin. Code §§ 75–02–02.1–27 and 75–02–02.1–28, other assets that are "actually available" must be considered in determining the applicant's eligibility for Medicaid. N.D. Admin. Code § 75–02–02.1–25(1); *Estate of Gross v. North Dakota Dep't of Human Servs.,* 2004 ND 190, ¶ 8, 687 N.W.2d 460. Assets are "actually available" under N.D. Admin. Code § 75–02–02.1–25(1) when the assets are at the disposal of the applicant, recipient, or responsible relative who has a legal interest in a liquidated sum and that person has the legal ability to make the sum available for support, maintenance, or medical care. *Estate of Gross,* at ¶ 8.

[¶ 11] Determining whether an asset is "actually available" for purposes of Medicaid eligibility is largely a fact-specific inquiry depending on the circumstances of each case. *Linser,* 2003 ND 195, ¶ 11, 672 N.W.2d 643. The "actually available" requirement must be interpreted reasonably, and the focus is on the applicant's actual and practical ability to make an asset available as a matter of fact, not legal fiction. *Opp v. Ward County Soc. Servs. Bd.,* 2002 ND 45, ¶ 11, 640 N.W.2d 704.

[¶ 12] "Contractual rights to receive money payments" are considered available assets and there is a presumption that the holder's interest in contractual rights to receive money payments is saleable without working an undue hardship. N.D. Admin. Code § 75–02–02.1–30(1) and (2). The presumption may be rebutted by evidence demonstrating that the contractual rights are not saleable without working an undue hardship. N.D. Admin. Code § 75–02–02.1–30(2). "Property which is not saleable without working an undue hardship"

is defined as "property which the owner has made a good-faith effort to sell which has produced no buyer willing to pay an amount equaling or exceeding seventy-five percent of the property's fair market value." N.D. Admin. Code § 75–02–02.1–01(23). Under N.D. Admin. Code § 75–02–02.1–01(12), a "[g]ood-faith effort to sell" is defined as "an honest effort to sell in a manner which is reasonably calculated to induce a willing buyer to believe that the property offered for sale is actually for sale at a fair price" and "includes, at a minimum, making the offer at a price based on ... [a] method which produces an accurate reflection of fair market value." A good-faith effort to sell also includes offering the property for sale "[t]o the regular market for such property, if any regular market exists." N.D. Admin.Code § 75–02–02.1–01(12)(b).

[¶ 13] In *Estate of Gross,* 2004 ND 190, ¶ 16, 687 N.W.2d 460, this Court held monthly payments from an annuity are a holder's interest in a contractual right to receive money payments within the meaning of N.D. Admin. Code § 75–02–02.1–30(1) and (2). The institutionalized spouse in that case entered a nursing home in June 2002 and his community spouse purchased a nonassignable $150,000 annuity in July 2002, which was designed to provide her 60 monthly payments beginning in August 2002. *Estate of Gross,* at ¶¶ 2–3. The institutionalized spouse's September 2002 application for Medicaid benefits was denied because Logan County Social Services concluded his countable assets included the nonassignable annuity and the total of those assets exceeded his personal exemption and the community spouse's asset allowance. *Id.* The institutionalized spouse's estate argued that the Department erred in treating the income stream and the annuity itself as distinct and separate from each other, and because the

annuity was not assignable, the income stream from the annuity could not be sold. *Id.* at ¶ 14. We rejected this argument:

An annuity is "a payment of a fixed sum of money at regular intervals of time," *see Webster's New World Dictionary* 56 (2nd Coll. Ed.1980), which parallels the administrative regulation that a contractual right to receive money payments is an available asset. *See* N.D. Admin. Code § [75–02–02.1–30(1)]. Although the annuity itself was not assignable, Julia Gross was designated as the owner and the payee of the annuity, and the annuity authorized her to "change the Payee at any time." Although the Estate argues the change of payee issue was not raised below, that issue was contemplated by Nordwall's [the Department's Director for Economic Assistance Policy] testimony that there was a market for the monthly payments from the annuity. According to Nordwall, there was a market for the monthly payments or income stream from the annuity, and the Estate has cited no other provisions in the annuity that would preclude a separate sale of those payments.

*Id.* at ¶ 15.

[¶ 14] We also concluded a preponderance of the evidence supported the Department's finding that the community spouse failed to make a good-faith effort to sell the monthly payments from the annuity. *Estate of Gross,* at ¶ 1. Although the estate had presented evidence that there were no buyers for the annuity because it was non-assignable, a Department representative and an employee of the company that issued the annuity testified there was a secondary market for the sale of monthly payments from the annuity. *Id.* at ¶ 12. Because the estate offered only the annuity contract itself for sale, rather than the contractual rights to receive money payments or the stream of income from the annuity, we concluded the Department's finding that the community spouse did not make a good-faith effort to sell the monthly payments from the annuity was supported by a preponderance of the evidence. *Id.* at ¶¶ 13, 16.

[¶ 15] Although the Department relies on *Estate of Gross* as authority for its denial of Medicaid benefits in this case, *Estate of Gross* is distinguishable for several significant reasons. First, in *Estate of Gross,* the community spouse's purchase of the annuity one month after the institutionalized spouse entered a nursing home and two months before applying for benefits was an obvious attempt to shelter $150,000 in otherwise available assets from Medicaid. Here, Pladson purchased the annuity more than nine years before entering a nursing home and more than 14 years before applying for benefits. Second, the annuities are fundamentally different. Although the annuity involved in *Estate of Gross,* 2004 ND 190, ¶ 15, 687 N.W.2d 460, was not assignable, the annuity authorized the owner and payee to "'change the Payee at any time.'" Pladson's annuity is more restrictive, expressly prohibiting the assignment of the annuity contract itself as well as "any payments under it."

[¶ 16] Third, in *Estate of Gross,* at ¶¶ 11–12, the Department presented "definite" evidence through its representative and an employee of the company that issued the annuity that there was a long-established secondary factors market for the sale of annuity payments or the "stream of income" from that particular type of annuity. In this case, the evidence presented of an available market for Pladson's annuity is ambiguous at best. The Department's primary witness, Melissa Hauer, the director of the Department's legal advisory unit, did not differentiate

between an annuity prohibiting assignment of the contract itself and an annuity also prohibiting assignment of the payments or stream of income when addressing saleability. She testified that, "based on the research that I've done and I've done extensive research on annuities and companies and investors who will purchase income stream, such as annuities, and yes, I am aware that there is a market out there for the purchase of even 'nonassignable' annuities." Hauer said she had spoken with companies about selling the stream of income from an annuity "without changing the contract between ... the insurer and the annuitant," and was "told" there are "at least a couple of ways ... it can be done" if the annuitant and purchaser enter into a separate contract. She testified:

> One of the ways it can be done is for the owner of the annuity to open a joint bank account with the purchaser of the annuity. The payments from the annuity goes [sic] into that joint account and the purchaser of the annuity then withdraws the funds. Another way that I understand this can be done is through the use of a post office box where the owner of the annuity directs the payment to be mailed to the post office box, and the owner of the annuity also signs a Power of Attorney authorizing the purchaser of the annuity to go into the PO box, take the check, and endorse it.

Hauer testified she had spoken with two of the three companies that had rejected Erickson's offer "not about this particular annuity, just about their business ... [i]n general." Hauer testified that she had spoken to other companies that would purchase a stream of income from an annuity, but discussed "nonassignable annuities in general." Although Hauer testified Pladson's annuity's prohibition against payment assignments "doesn't mean that they can't be sold," she did not identify a factoring company that would buy a stream of payments from an annuity that prohibited payment assignments.

[¶ 17] The fourth reason this case is distinguishable from *Estate of Gross* is because the Department provided to Erickson a list of "companies that purchase such streams of income, providing the individual with lump sum cash payments immediately," and Erickson documented their refusals to accept her offer. Erickson testified that she contacted four of the five companies provided to her by the Department and offered to sell the stream of income from Pladson's annuity. The company Erickson did not contact advertised itself on its Internet website as only "Buyers of Structured Settlements and Lottery Payments." The website for one of the companies contacted by Erickson stated the company "buys payments stemming from structured settlements, senior settlements, state lottery winnings, casino jackpot winnings, estates, trusts and *other periodic payment contracts.*" (Emphasis added). This company responded by fax that it was unable to make a purchase "because the annuity is nonassignable." The website for another company Erickson contacted advertised that it provided "direct funding for cash flows derived from structured settlements [and] annuities," and that it "*liquidates cash flows of all types.*" (Emphasis added). This company responded that after carefully reviewing the supplementary agreement, it "purchases annuity payments that have been set up through structured settlements. Unfortunately your policy does not fall within our current requirements, and we are unable to make an offer." Another company website advertised, "Sell Your ... Annuity Payments," and that the company provided "new and exciting options never before available for people to solve their cash flow problems, by selling their payments in exchange for a lump sum of

cash today!" Yet, this company also rejected Erickson's offer, responding:

> The second type of annuity we work with is a self-purchased annuity. These are most often assignable, and are therefore available for purchase. Unfortunately, your mothers [sic] annuity, although self-purchased, clearly states that it is non-assignable. Furthermore, Thrivent Financial for Lutherans (the administrator of this annuity) has stated clearly in our inquiries that they absolutely would not allow any assignment or transfer to a for-profit company.

> This is the extent of our options. I am very sorry that after all our research, we have found no way to liquidate this annuity. It appears that the annuity is not sellable, not assignable, and will have to run it's [sic] course as it was written.

[¶ 18] Hauer testified, and the ALJ found that, in view of the correspondence rejecting Erickson's offers, Erickson must have incorrectly attempted to sell the annuity contract itself rather than the stream of income or payments from the annuity, and therefore, Erickson failed to make a good-faith effort to sell the stream of income from the annuity. The Department seems to imply it is the seller's burden to suggest to the buyer methods by which the buyer could purchase a particular annuity or its stream of payments. The Department's position ignores that companies in the secondary factors market would be reasonably knowledgeable about the factoring business and, when provided annuity documents by less sophisticated potential sellers, those companies would explore and propose other options even if the seller's specific offer could not be accepted. None of the companies responding to Erickson's offers proposed the Department's vision of a separate contract between a purchaser and an elderly institutionalized annuitant to obtain the stream of payments from the annuity.

[¶ 19] We must interpret the "actually available" requirement in a reasonable manner, and recognize that the focus is on the applicant's actual and practical ability to make an asset available as a matter of fact rather than legal fiction. *Opp*, 2002 ND 45, ¶ 11, 640 N.W.2d 704. Even if we assume for purposes of argument that the evidence is sufficient to show there is a secondary factors market for the stream of income from Pladson's annuity, *but see Estate of F.K. v. Division of Med. Assistance and Health Servs.*, 374 N.J.Super. 126, 863 A.2d 1065, 1074, 1077 (A.D.2005) (no evidence supported findings of the existence of a viable secondary annuities market for a nonassignable annuity that also prohibited assignment of payments or that the income stream from the annuity could be sold on such a market), Erickson made offers of sale to the very companies the Department indicated would purchase the payment stream from the annuity without any success.

[¶ 20] We conclude a reasoning mind reasonably could not have determined from the evidence in the record that Erickson failed to make a good-faith effort to sell the stream of payments from Pladson's annuity. Because Erickson made a good-faith effort that produced no purchasers, Pladson's estate has shown the annuity and its stream of payments are not saleable without working an undue hardship. Consequently, we conclude the Department erred in ruling that Pladson's available assets exceeded the $3,000 Medicaid limit because the annuity and its stream of payments should have been excluded from consideration in determining Pladson's Medicaid eligibility.

### III

[¶ 21] The district court's judgment and order are affirmed.

[¶ 22] DALE V. SANDSTROM, DANIEL J. CROTHERS, MARY MUEHLEN MARING, and CAROL RONNING KAPSNER, JJ., concur.