**MARTIN, Appellee,**

v.

**OHIO DEPARTMENT OF HUMAN SERVICES, Appellant.**

[Cite as *Martin v. Ohio Dept. of Human Serv.* (1998), 130 Ohio App.3d 512.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 98 CA 7.

Decided Nov. 20, 1998.

---

4. Appellant claimed in the supplemental complaint that one tenet of appellant's religious beliefs is modesty.

*Martin, Pergram & Browning Co., L.P.A.,* and *William J. Browning,* for appellee.

*Betty D. Montgomery,* Attorney General, and *Karen Lazorishak,* Assistant Attorney General, for appellant.

---

BROGAN, Judge.

Appellant, the Ohio Department of Human Services ("ODHS"), appeals from a judgment of the Champaign County Court of Common Pleas reversing an administrative determination that appellee, Richard Martin, was ineligible for Medicaid benefits. The common pleas court held that an IRA owned by appellee's spouse should not have counted in the determination of appellee's eligibility for nursing-home Medicaid benefits. The lower court also held that ODHS erred in retroactively applying a regulation that related to eligibility calculations. On appeal from that judgment, we hold that a spouse's IRA is a countable resource under the Medicare Catastrophic Coverage Act of 1988, Section 1396r–5, Title 42, U.S.Code. Thus, we reverse the lower court's judgment in that regard. We agree, however, that the retroactive application of regulations was improper. Thus, we affirm the judgment in part and remand this cause to the agency to reconsider appellee's eligibility for Medicaid benefits.

## I

The facts of this case are not in dispute. Richard Martin resides in a nursing home. His wife, Mary Jo Martin, does not live in the nursing home, but lives nearby. On August 7, 1994, on behalf of her husband, Mrs. Martin applied to the Champaign County Department of Human Services ("CCDHS") for Medicaid Benefits. The application was denied for the reason that Mr. Martin had resources in excess of the eligibility requirements. The Martins applied a second time on July 31, 1995, and that application was also denied, for the same reason. The couple did not appeal from either of these determinations of ineligibility.

A third application for Medicaid benefits was filed on December 29, 1995. The CCDHS sent the Martins a notice of denial on March 21, 1996. The Martins then challenged that denial and asked for a hearing before ODHS. Besides appealing from the most recent denial of benefits, the Martins also asked ODHS to consider

granting benefits retroactively for the two previously denied applications. A hearing was held on May 29, 1996. The state hearing officer overruled the appeal on all issues in a decision issued on July 16, 1996.

On July 31, 1996, the Martins took an administrative appeal. The administrative hearing examiner reversed the decision of the hearing officer on the grounds that the denial of benefits was not accompanied by proper notice required under Ohio Adm.Code 5101:6–7–01. The hearing examiner did agree with the officer, however, that Mrs. Martin's IRA had to be counted as part of the couple's total resources for the purposes of Mr. Martin's eligibility determination.

On September 13, 1996, Mr. Martin filed a notice of appeal to the Champaign County Court of Common Pleas. The common pleas court held that ODHS had erred by including Mrs. Martin's IRA among the couple's countable resources. The court held further that ODHS had erred by applying regulations that went into effect on January 1, 1996, to Mr. Martin's December 29, 1995 application. Finally, the court ruled that Mr. Martin was prejudiced by a lack of proper notice on his two prior applications. Accordingly, the court remanded the case to the ODHS with instructions to recalculate Mr. Martin's eligibility as of his first application for benefits.

The ODHS now appeals from the common pleas court's judgment.

## II

Appellant's second assignment of error is as follows:

■ "The funds held by the community spouse in an Individual Retirement Account (IRA) are countable resources for purposes of determining the institutionalized spouse's eligibility for Medicaid."

We consider appellant's second assignment of error first because the issue raised is the one that lies at the heart of this appeal, namely, whether a spouse's IRA should be counted as a resource when determining a married person's eligibility for Medicaid benefits to pay for nursing-home care. ODHS argues that the common pleas court erred when it concluded that Mrs. Martin's IRA was not a countable resource. Full consideration of this argument requires that we review how the Medicaid program operates, generally throughout the nation, and particularly in the state of Ohio.

## A. The Medicaid Program

Medicaid was enacted in 1965 as Title XIX of the Social Security Act. For states that choose to participate, the program provides federal funds to pay for the medical treatment of needy persons. State plans must comply with the both the act itself and the requirements of the Secretary of Health and Human

Services. *Schweiker v. Gray Panthers* (1981), 453 U.S. 34, 36–37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460, 465.

The Social Security Act requires states participating in the Medicaid program to make assistance available to individuals classified as "categorically needy." These are persons qualified to receive certain federal welfare benefits under the act. In 1972, Congress substantially expanded the welfare benefits available under the Social Security Act by replacing several state-run programs with a new federally administered program: Supplemental Security Income for the Aged, Blind, and Disabled ("SSI"), Section 1381 *et seq.*, Title 42, U.S.Code. The adoption of SSI proportionally expanded the class of persons who would be classified as "categorically needy" under the Medicaid program. Congress feared that this expansion might cause some states to withdraw from Medicaid altogether. Thus, Congress offered what has become known as the "209(b) option," now codified at Section 1396a(f), Title 42, U.S.Code. See *Schweiker*, 453 U.S. at 38, 101 S.Ct. at 2637, 69 L.Ed.2d at 466–467.

If a state elects the 209(b) option, it is permitted to restrict the availability of Medicaid benefits. The restrictions, however, may not exclude individuals who would have been eligible under the state regulations in effect in 1972. Moreover, if an individual in that state is eligible for SSI benefits, but not Medicaid benefits, as that person encounters medical expenses, he must be permitted to "spend down" his resources to the eligibility levels adopted by the state. As a consequence of the 209(b) option, states may be classified, for the purposes of the Medicaid program, as either "SSI states" or "209(b) states" depending on how they make benefits available. *Schweiker*, 453 U.S. at 38–39, 101 S.Ct. at 2637–2638, 69 L.Ed.2d at 466–467. Ohio is a 209(b) state.

In addition to providing federal funds for the "categorically needy," the Social Security Act also permits states to receive federal funds for aiding people who are not eligible for welfare benefits but whose resources are too low to meet their medical expenses. See Sections 1396a(a)(10)(C) and 1396d(a), Title 42, U.S.Code. This class of persons is designated as the "medically needy." See *Atkins v. Rivera* (1986), 477 U.S. 154, 157, 106 S.Ct. 2456, 2459, 91 L.Ed.2d 131, 138. States are not required to provide Medicaid benefits to the medically needy. *Gandenberg v. Barry* (S.D.Ohio 1988), 687 F.Supp. 346, 350. However, when states opt to provide such benefits, they are required to use standards that are "reasonable" and "comparable" for all groups. Section 1396a(a)(17); *Atkins*, 477 U.S. at 158, 106 S.Ct. at 2459, 91 L.Ed.2d at 137–138. Another limitation on eligibility standards for the medically needy lies in Section 1396a(a)(10)(C)(i)(III), which requires that state Medicaid plans include a description of "the single standard to be employed in determining income and resource eligibility, which shall be no more restrictive that the methodology which would be employed

under the supplemental security income program in which such program is in effect."

This section, with its "no more restrictive methodology" language, permits states to set their own standards of income eligibility, but requires them to treat "components of income" the same as—or more leniently than—they would when determining SSI eligibility. *Mistrick v. Div. of Med. Assistance & Health Serv.* (1998), 154 N.J. 158, 168, 712 A.2d 188, 194; see, also, *Atkins,* 477 U.S. at 163, 106 S.Ct. at 2461, 91 L.Ed.2d at 140–141 (interpreting earlier "same methodology" language).

209(b) states, like Ohio, draw their Medicaid plans independent of SSI eligibility standards. Thus, they do not have special programs for the "medically needy." Nevertheless, the category is still relevant in 209(b) states. Under Section 1396a(f), if an individual would normally be entitled to categorical Medicaid benefits in an SSI state, that person is classified as "categorically needy," *i.e.,* eligible to receive benefits under Section 1396a(a)(10)(A). Any person who is not eligible for SSI but still receives Medicaid benefits under his state's 209(b) program is classified as medically needy, *i.e.,* eligible to receive benefits under Section 1396a(a)(10)(C). It does not appear that Ohio's Medicaid program serves any individuals who are classified as medically needy. See *Gandenberg,* 687 F.Supp. at 350.

Because Ohio does not provide benefits to the medically needy, the "no more restrictive methodology" requirement of Section 1396a(a)(10)(C)(i)(III) has no effect on state standards for determining income and resource eligibility. The "no more restrictive methodology" requirement, however, also appears at Section 1396a(r)(2), which provides:

"(2)(A) The methodology to be employed in determining income and resource eligibility for individuals [in a number of different categories, including all Medicaid recipients in 209(b) states] may be less restrictive, and shall be no more restrictive, than the methodology—

"(I) in the case of groups consisting of aged, blind, or disabled individuals, under the supplemental security income program under chapter XVI of this chapter, or

"(ii) in the case of other groups, under the State plan most closely categorically related.

"(B) For purposes of this subsection and subsection (a)(10) of this section, methodology is considered to be 'no more restrictive' if, using the methodology, additional individuals who are eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance."

Thus, when calculating the components of income for an aged person like Mr. Martin, 209(b) states like Ohio must use a methodology that is no more restrictive than that employed in determining SSI eligibility. Furthermore, "no more restrictive" means that no component of income may be considered if, treating eligibility levels as though they were the same, consideration of that resource would render any person ineligible for Medicaid who is eligible for SSI.

### B. The Medicare Catastrophe Coverage Act of 1988.

As a nursing home resident, Mr. Martin's eligibility for Medicaid is particularly dependent on Section 1396r–5, Title 42, U.S.Code. That section was enacted by Congress as part of the Medicare Catastrophe Coverage Act of 1988 ("MCCA"). Although most provisions of that Act were repealed in 1989, this section has been retained. See *Mistrick*, 154 N.J. at 170, 712 A.2d at 194, fn. 1. The statute was designed, in part, to prevent the impoverishment of one spouse when the other enters a nursing home.

Generally, for the purposes of Medicaid eligibility, a married couple's jointly held assets are "deemed" available for the care of either spouse. See *Schweiker*, 453 U.S. at 39, 101 S.Ct. at 2637–2638, 69 L.Ed.2d at 467. Thus, prior to 1988, a married person in a nursing home had to "spend down" all of the family assets to the relevant eligibility limits before he or she could become eligible for assistance. Both husband and wife could be reduced to poverty by medical expenses before either one of them could receive Medicaid assistance to pay for nursing home care. The spousal impoverishment section of the MCCA, codified at Section 1396r–5, was enacted to remedy that situation. See *Mistrick*, 154 N.J. at 169–70, 712 A.2d at 194.

Prior to the enactment of the MCCA, it was also possible for a married couple to divert resources so that they were held solely in the name of the spouse not seeking Medicaid benefits. Because SSI standards deemed only jointly held assets available for the institutionalized spouse's needs, some couples could shelter significant amounts of money while still receiving federal benefits. The MCCA closed this loophole by considering all of a couple's resources, regardless of whether they were separately held. *Id.* at 170, 712 A.2d at 194–95.

The MCCA permits the spouse living outside the nursing home (designated the "community spouse") to keep half of the couple's resources, generally, without affecting the eligibility of the spouse within the nursing home (designated the "institutionalized spouse"). After the equal division, the community spouse's share must fit within certain minimum and maximum amounts that are indexed to inflation. The adjusted amount is designated the Community Spouse Resource Allowance ("CSRA"). Section 1396r–5(f)(2). Any of the couple's resources that are not part of the CSRA, and are not otherwise excluded from consideration, are

deemed available to the institutionalized spouse. The institutionalized spouse may then spend down any amount in excess of the eligibility levels to receive Medicaid benefits.

The MCCA also permits the community spouse to retain a certain amount of the couple's income or resources per month, which money is set aside for his or her support. This amount is designated the Minimum Monthly Maintenance Needs Allowance ("MMMNA"). Section 1396r–5(d)(3)(C). The couple's income is divided according to the "name on the check" principle, under which wages or other income are assigned to the spouse who nominally earned the money. Income paid in the name of both spouses is divided equally. The community spouse's income, then, is left out of the institutionalized spouse's eligibility determination. See Section 1396r–5(b); *Chambers v. Ohio Dept. of Human Serv.* (C.A.6, 1998), 145 F.3d 793, 799. If it then happens that the community spouse's income falls below the MMMNA, and the spouse's resources are insufficient to produce income to meet the minimum, the institutionalized spouse may divert some income or resources to the support of his spouse. Section 1396r–5(e)(2)(c); see, also, *Chambers,* 145 F.3d at 799.

In calculating Mr. Martin's eligibility for Medicaid under the MCCA, ODHS counted Mrs. Martin's IRA. Thus, half the value of the IRA was deemed available to Mr. Martin. This amount rendered him ineligible for Medicaid benefits. On appeal from the administrative determination, however, the common pleas court concluded that federal law barred the consideration of IRAs for the purposes of Medicaid eligibility. In reaching that conclusion, the lower court relied heavily on the reasoning of the New Jersey intermediate appellate court in *Mistrick v. Div. of Med. Assistance & Health Serv.* (1997), 299 N.J.Super. 76, 690 A.2d 651.

## C. The *Mistrick* Decisions

In *Mistrick,* the Appellate Division of the New Jersey Superior Court held that a community spouse's IRA could not be counted as a resource in determining an institutionalized spouse's eligibility for Medicaid. *Id.* at 82, 690 A.2d at 654. As ODHS now points out, the New Jersey Supreme Court has since rendered an opinion reversing the appeals court's decision in *Mistrick.* 154 N.J. 158, 712 A.2d 188. We, of course, are not bound by either New Jersey court's ruling, and we are free to follow either opinion should we find that the interpretation of the relevant law provided therein is correct. Accordingly, we will review the relevant analyses of the two decisions.

The intermediate appellate court decision, on which the Champaign County court relied, overturned New Jersey regulations that counted IRAs as resources that should be considered in the determination whether an institutionalized

spouse was eligible for Medicaid. 299 N.J.Super. at 83, 690 A.2d at 654. The appellant in *Mistrick* was an institutionalized spouse who was applying for benefits as a medically needy person. The administrative agency in charge of Medicaid in New Jersey denied coverage because the appellant's husband had an IRA that brought the couple's resources above eligibility levels. The appeals court then reversed the agency, holding that the IRA was not a countable resource.

The appeals court's judgment rested on the "no more restrictive methodology" language of Section 1396a(a)(10)(C)(i)(III) and Section 1202(a), Title 20, C.F.R., which provides:

"In the case of an individual who is living with a person not eligible under this part and who is considered to be the husband or wife of such individual * * *, such individual's resources shall be deemed to include any resources, not otherwise excluded under this subpart, of such spouse whether or not such resources are available to such individual. In addition to the exclusions listed in § 416.1210, pension funds which the ineligible spouse may have are also excluded. 'Pension funds' are defined as funds held in individual retirement accounts (IRA), as described by the Internal Revenue Code, or in work-related pension plans (including such plans for self-employed individuals, sometimes referred to as Keogh plans)."

As the court noted, in certain cases, this regulation mandates that, when determining SSI eligibility, the "pension funds" of one spouse (including IRAs) should not be included as a resource of the other. 299 N.J.Super. at 82, 690 A.2d at 654. Thus, the court reasoned that state Medicaid regulations may not include IRAs as a resource under the MCCA because doing so amounted to use of a methodology more restrictive than that permissible for determining SSI eligibility. *Id.* at 82, 690 A.2d at 654. This was the logic, then, that underlay the common pleas court's judgment in Mr. Martin's case.

The administrative agency appealed from the judgment of the appellate division to the New Jersey Supreme Court. The Supreme Court rejected the lower court's reasoning and found that IRAs are a countable resource. *Mistrick*, 154 N.J. at 174, 712 A.2d at 197. The Supreme Court's opinion relied on the provisions of the MCCA.

The court noted that the MCCA expressly states that it supersedes any other provisions of the same title that are inconsistent with it. *Id.*; Section 1396r–5(a)(1) ("the provisions of this section supersede any other provision of this subchapter * * * which is inconsistent with them"). Next, the court observed that the MCCA has its own method of determining resources. 154 N.J. at 174, 712 A.2d at 197. Section 1396r–5(c) defines "resources" to exclude those exempted under subsection (a) or (d) of Section 1382b. Those subsections list a number

of specific exclusions, including the marital home, household goods and automobile, but IRAs and other retirement plans are not included. For this reason, the New Jersey Supreme Court held that Section 1396a(a)(10)(C)(i)(III), on which the appeals court had relied, was in conflict with the provisions of the MCCA and was, therefore, superseded by it. 154 N.J. at 174, 712 A.2d at 197. Because IRAs were not specifically protected by the MCCA, the court concluded that they should be factored into the calculations of a nursing home patient's eligibility for Medicaid. *Id.*

### D. Medicaid Coverage in Ohio

One difference that is readily apparent between Mr. Martin's case and the *Mistrick* case is that *Mistrick* involved an application for benefits as a medically needy person. As the ODHS points out, Ohio does not offer Medicaid benefits to the medically needy. Consequently, the agency argues that Section 1396a(a)(10)(C)(i)(III), which determined the outcome of the *Mistrick* appeals court decision, has no relevance to the instant case. We agree. Nevertheless, we cannot avoid the question of whether Ohio's methodology is impermissibly restrictive. As noted above, Section 1396a(r)(2) also contains a "no more restrictive methodology" requirement. That requirement squarely applies to state plans that take advantage of the 209(b) option. When a state agency is making a determination of eligibility under a 209(b) plan, it is prohibited by 1396a(r)(2) from using a methodology that is more restrictive than the federal standards for determining SSI eligibility.

ODHS also argues that, because Ohio, as a 209(b) state, does not use SSI eligibility standards, the "no more restrictive methodology" requirement is inapplicable. Again, however, Section 1396a(r)(2) clearly prohibits the use of methodologies more restrictive than SSI in any cases involving aged, blind, or disabled individuals in 209(b) states. Consequently, although there are differences as to what sections of the Social Security Act apply, we cannot distinguish the *Mistrick* case on these grounds.

Therefore, we must directly address the question of whether federal law prohibits states from counting a spouse's IRA as an available resource in an eligibility determination—as the New Jersey Appellate Division found—or whether the MCCA supersedes other provisions of the federal code and mandates the inclusion of the IRA as an available resource—as the New Jersey Supreme Court found. On this question, we find the reasoning of the New Jersey Supreme Court more persuasive.

As the New Jersey Supreme Court noted, the provision of the MCCA establishing that it supersedes conflicting provisions of the federal code indicates that the MCCA establishes a separate method of evaluating resources for Medicaid

eligibility for institutionalized spouses. The method established is generally much more lenient in the exclusion of resources than SSI standards. To the extent that the MCCA is less lenient, it was intended to remedy prior inequities between married couples created by different recognition of whether assets were held in the name of one spouse or the other. A rule that would exclude an IRA held by the community spouse would only revitalize this old distinction by treating that couple more leniently than one in which the institutionalized spouse held the IRA. We are not troubled, therefore, that the MCCA might consider a resource available that is excluded under SSI standards.

■ Furthermore, by referring to specific statutory exclusions, Congress evidenced an intent that other statutory resource exclusions not apply. *Inclusio unius est exclusio alterius* ("The inclusion of one is the exclusion of another"). Black's Law Dictionary (6 Ed.1990) 763. If all other resource exclusions under SSI standards applied to the MCCA, the specific references to Sections 1382b (a) and (d)—which are themselves SSI resource exclusions—would be superfluous. Generally, a statute will be construed so as to give effect to all of its provisions. *Commonwealth Loan Co. v. Downtown Lincoln Mercury Co.*, (1964), 4 Ohio App.2d 4, 6, 33 O.O.2d 6, 7, 211 N.E.2d 57, 58–59. Thus, we agree with the New Jersey Supreme Court that the MCCA supersedes any other provisions that might otherwise have excluded IRA's from resource calculations.

Nonetheless, appellee has argued that, even if the New Jersey Supreme Court was right about federal standards of eligibility under the MCCA, Ohio, as a 209(b) state, might still be required to exclude IRAs if its Medicaid program in 1972 would have excluded IRAs. This argument fails, however, for at least two reasons. First, Section 1396a(f) permits states to exclude SSI-eligible persons from Medicaid whom they would have excluded in 1972, but it does not require them to include, based on 1972 standards, persons who are not eligible for SSI. Second, and more important, the provisions of the MCCA expressly supersede Section 1396(a)(f). See Section 1396r–5(a)(1). Thus, Ohio's status as a 209(b) state does not affect how resources should be calculated for individuals who fall within the coverage of the MCCA.

For the foregoing reasons we sustain appellant's second assignment of error. The ODHS did not err when it incorporated Mrs. Martin's IRA into its calculation of marital resources. On this question, the judgment of the Champaign County Common Pleas Court is reversed.

### III

Appellant's first assignment of error is as follows:

"The trial court lacked jurisdiction to order ODHS to recalculate Richard Martin's Medicaid eligibility based on applications prior to the December 29, 1995 application."

■ The error assigned here concerns the scope of the trial court's judgment, which reached not only the application directly appealed, but also two earlier applications for Medicaid that were denied but not appealed. ODHS contends that the trial court lacked jurisdiction to consider the earlier applications. We might be inclined to agree that reconsideration of the earlier applications was barred by *res judicata*. *Cole v. Complete Auto Transit, Inc.* (1997), 119 Ohio App.3d 771, 777, 696 N.E.2d 289, 292. ODHS does not argue *res judicata*, however, which is an affirmative defense, not a jurisdictional bar. *State ex rel. Freeman v. Morris* (1991), 62 Ohio St.3d 107, 109, 579 N.E.2d 702, 703.

In any event, we find that this question is now moot. Mr. Martin has not asserted that the earlier decisions made on his applications erred other than by considering his wife's IRA as an available resource. Because we have found that this treatment of the IRA was proper, there is no longer any cause to reconsider the earlier applications.

### IV

Appellant raises the following as its third assignment of error:

"ODHS's annuity rule for calculating the rate of return on resources was properly applied by the agency to a state hearing which was held after the effective date of the annuity rule."

■ This assignment of error concerns the applicability of a regulation that took effect on January 1, 1996. Mr. Martin's latest application for benefits was submitted on December 29, 1995. The common pleas court ordered ODHS to reconsider Martin's application according to the regulations in effect on the date of his application. In this, ODHS assigns error.

The regulation in question, Ohio Adm.Code 5101:6–7–02, governs any request for a community spouse's resource allowance ("CSRA") to be increased if he or she currently receives less than the requires minimum monthly income allowance ("MMMNA"). The new regulation looks at the difference between the MMMNA and the income actually received per month. The hearing officer, then, considers the cost of a Single Premium Lifetime Monthly Payment Annuity ("SPLIMPA") to provide monthly payments equal to make up that difference. If there are sufficient moneys in the CSRA to purchase such a SPLIMPA, the request is denied. If the CSRA is insufficient, only enough resources as would be necessary to purchase the appropriate SPLIMPA may be diverted. Ohio Adm.Code 5101:6–7–02(e)–(i).

Prior to January 1, 1996, the regulation permitted the transfer of resources to the CSRA "in relation to the amount of income generated," but the regulation was silent as to how the income generating potential was to be measured. Former Ohio Adm.Code 5101:6–7–02(A)(4), 1992–1993 Ohio Monthly Record 1359, effective June 1, 1993. As an annuity, the SPLIMPA returns both interest and part of the principal with each payment. The Martins want only potential interest to be considered income, thus permitting more of the couple's resources to be diverted to the CSRA. They argue that such an "interest only" approach was the only one permissible under the former regulation.

■■ We begin our analysis of this issue by noting that laws are presumed to operate prospectively. See *Batchelor v. Newness* (1945), 145 Ohio St. 115, 120, 30 O.O. 314, 316, 60 N.E.2d 685, 687. Nothing in the regulation in question indicates that it would operate retroactively. Thus, prospective application is warranted. Generally for Medicaid eligibility, moreover, the rules in effect on the date of application for benefits should apply. See *Miller v. Ohio Dept. of Human Serv.* (1995), 105 Ohio App.3d 539, 543, 664 N.E.2d 619, 621.

ODHS does not dispute any of these rules of law, however. Rather, ODHS argues that the SPLIMPA regulation applies to an appellate procedure. The Martins asked for some share of their resources to be assigned to Mrs. Martin to bring her income above the MMMNA. This adjustment can only be performed in a hearing after an application is denied. Section 1396r–5(e)(2)(C), Title 42, U.S.Code. Because Mr. Martin did not request a hearing until 1996, ODHS argues, the new regulation was properly applied.

■■ We do not agree with the ODHS analysis. After Mr. Martin filed his application, his claim for benefits was pending. Absent some express intention that the regulation would operate retroactively, a change in a rule affecting appellate procedures should not apply to pending claims. See *Tague v. Bd. of Trustees, Ohio State Univ.* (1980), 61 Ohio St.2d 136, 139, 15 O.O.3d 168, 169–170, 399 N.E.2d 1240, 1241–1242 (interpreting a statutory change in administrative procedures). Furthermore, the rule in question is substantive in nature rather than procedural. The rule affects the determination of who will receive Medicaid benefits in Ohio. Retroactive application of administrative rules is particularly disfavored when substantive rights are involved. See 2 American Jurisprudence 2d (1994) 254–55, Administrative Law, Section 236. Thus we reject the argument that the new regulation could be applied to Mr. Martin's application.

ODHS also argues that remanding this case to the hearing officer will be unnecessary because application of the SPLIMPA standard was permissible under the regulation in effect in December 1995. If the case is remanded, the agency argues, the officer could use that SPLIMPA standard, and the result

would be the same. In support of this position, ODHS cites *Clark v. Ohio Dept. of Human Serv.* (Sept. 4, 1997), Huron C.P. No. CV–97–206, unreported. In that case, the Huron County Common Pleas court found that the new SPLIMPA regulation could not apply to an application filed before its effective date. Nevertheless, it stated that "the SPLIMPA rate of return is a reasonable rate of return" that could have been used under the previous regulation. *Id.* at 4. This statement, however, was an *obiter dictum*, as the court explained that even under an "interest only" approach, the application would have been denied. We do not assign much weight to the *Clark* court's *dictum* on this subject.

ODHS also cites *Ford v. Iowa Dept. of Human Serv.* (Iowa 1993), 500 N.W.2d 26. In the *Ford* case, the Iowa Supreme Court held that a SPLIMPA standard, like the one subsequently adopted by the ODHS, was a reasonable interpretation of the federal law under the MCCA. See *id.* at 31–32. We do not address here the question of whether Ohio's SPLIMPA regulation violates the MCCA, because that issue has not been raised on appeal. Nevertheless, we recognize that this question and the one before us are closely related, because former Ohio Adm. Code 5101:6–7–02(A)(4) adheres very closely to the language of Section 1396r–5(e)(2)(b), Title 42, U.S.Code. Moreover, the Iowa Supreme Court's decision in *Ford* notwithstanding, we cannot but question an interpretation of the MCCA that requires a spouse to spend the minimum of resources protected under Section 1396r–5(f)(2)(A)(i) in order to achieve a minimum income level that is protected under Section 1396r–5(d)(2)–(3). Such an interpretation seems contrary to the notion that these are protected minimum allowances.

In any event, we reject the ODHS's contention that a SPLIMPA standard was permissible under the regulation in effect in 1995. The relevant subsection of that regulation stated:

"(4) If either the IS [institutionalized spouse] or the CS [community spouse] can document that the CS resource allowance (in relation to the amount of income generated by it) is inadequate to raise the CS's income to the MMMNA, a hearing decision may substitute a higher resource allowance to provide additional income as necessary. The hearing decision must specify the amount of the additional transfer authorized and must increase the CS resource allowance by the same amount."

 This regulation directed the hearing officer to consider the CSRA "in relation to the amount of income generated by it." When interpreting a regulation, just as with a statute, "words will be given the meaning commonly attributed to them, unless the contrary intention appears in the statute or regulation." *Pinnacle Woods Survival Game, Inc. v. Hambden Twp. Zoning Inspector* (1986), 33 Ohio App.3d 139, 140, 514 N.E.2d 906, 907–908. The common understanding of the word "income" does not include the return of

principal. The Internal Revenue Code, for example, permits the purchaser of an annuity to deduct the cost of his investment, over time, from the payments he receives on his annuity. See Section 72, Title 26, U.S.Code. Thus, the purchase price of an annuity is not considered income. See *id.* The SPLIMPA approach, in contrast, would treat both interest and principal as the "income" generated by the CSRA. We do not find this a reasonable interpretation of the former rule.

The amended regulation also uses the word "income." Nevertheless, the new regulation expressly adopts the SPLIMPA approach, and, to that extent, the word does not require interpretation according to its common meaning, as the new regulation directly expresses a contrary intention. Thus, the continued use of the word "income" does not dissuade us from our understanding that the adoption of the SPLIMPA regulation worked a significant change in how Medicaid benefits are to be distributed in Ohio. That change should not apply to applications filed before the effective date of the new rule.

For the foregoing reasons, we overrule appellant's third assignment of error. The judgment of the common pleas court is affirmed in this regard.

## V

Having sustained appellant's second assignment of error, we reverse that portion of the lower court's judgment that would have required the ODHS to reconsider Mr. Martin's three applications for Medicaid benefits without counting his wife's IRA as an available resource. We affirm, however, that portion requiring the hearing officer to reevaluate a change in Mrs. Martin's CSRA under the regulation in effect in December 1995, without using the SPLIMPA standards adopted by the amended regulation. This case will be remanded to the hearing officer for that purpose.

The judgment is affirmed in part and reversed in part, and the cause is remanded.

*Judgment accordingly.*

FREDERICK N. YOUNG, P.J., and FAIN, J., concur.